MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
OR IN THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT

Respectfully submitted,

__________/s/______________

Nancy Brewer, Bar #17088
The Zipin Law Firm, LLC
8403 Colesville Rd., Suite 610
Silver Spring, MD 20910
Ph: 513-979-4138 (preferred)
301- 587-9373
nbrewerwv@msn.com
Counsel for Plaintiff

Served electronically to:
sljohnson@co.md.pg.us

**TABLE OF CONTENTS**

BACKGROUND FACTS

Serious Illness, Followed by Retinal Surgery 2
Jimmy's Employment Status 4
Medical Advisory Board Reviews Jimmy's Records 4
Instruction to Report and Request for Accommodation 5
Dr. Rao, Familiar with the Job, Released Jimmy to Emergency Dispatcher 6
Dr. Phillips Knew the Job Requirements, Found Jimmy's Vision Sufficient 7
The Medical Advisory Board Meets, then Reverses Itself 9
Defendant Relied Entirely upon the Board's Decision 10
Defendant's Explanation for the Board's Determination 10
Dr. Falik Could Not Explain His Position: He is "not an ophthalmologist." 12
Dr. Phillips' Testimony 13
Dr. Phillips' June, 2007 Sick Certificate had been Rescinded 14
No Individualized Assessment of Jimmy's Limitations 15
Termination Based upon Substantially Limiting Impairment 17
Appeal Denied 18

JIMMY'S DISABILITY – DIABETES 18
Consequences of Diabetes - Impaired Immune System and Pneumonia 20
Consequences of the Diabetes – Diabetic Retinopathy 21
Consequences of the Diabetes - Kidney Failure 22

**ANALYSIS**

I. PLAINTIFF CAN ESTABLISH THE FIRST ELEMENT UNDER THE ADA 23
DIABETES AND ITS CONSEQUENCES 24
Substantial Limitation in Eating 24
Jimmy's Impaired Endocrine System is Substantially Limiting 26

Jimmy's Diabetic Retinopathy Substantially Limits His Ability to See        26

Jimmy's Kidney Disease  Substantially Limits His Ability to Eliminate Waste        27

Jimmy Is Protected as an Individual with an Actual Disability        29

PLAINTIFF COVERED  BASED ON STATEMENTS AND ADMISSIONS        30

ELEMENTS OF "REGARDED AS" CLAIM        30

ELEMENTS OF CLAIM BASED ON RECORD OF A DISABILITY        32

SUMMARY: JIMMY IS PROTECTED UNDER THE ADA        33


II.  THE SECOND ELEMENT:  A "QUALIFIED" INDIVIDUAL        33

Factual Inquiry Required of the Employer        34

Medical Examinations Must Be Fact Based        35

Defendant Failed to Find Out What Jimmy Could *Actually* Do        37

III.  NOTICE OF DISABILITY AND REQUEST FOR ACCOMMODATION        38

Individual Assessment is Also Required in "Regarded as" Claims        40

IV.  LIABILITY WHERE EMPLOYERS FAIL TO DO INDIVIDUAL ASSESSMENT        40

Defendant's Failure to Respond to Notice and Request for Accommodation        41

V.  THE SECOND ELEMENT:  PLAINTIFF   COULD DO THE JOB        42

Defendant's Unreasonable Reliance on an Outdated Sick Note        43

The Sick Note had been Rescinded        43

Defendant's Flawed Reasoning        44

Any Reasonable Inquiry Would Have Shown Jimmy was Qualified        45


**CONCLUSION**        46

# TABLE OF AUTHORITIES

Statutes and Regulations

42 U.S.C. § 12102(2)(A)(B)(C) (2000)

42 U.S.C. § 12111(9)(2000)

42 U.S.C. § 12111(8) (2000)

42 U.S.C. § 12112(b)(5)(A)

29 C.F.R. § 1630.2(h)(1) (2005)

29 C.F.R. Part 1630 App. (2005)

29 C.F.R. § 1630.2 (j)(1)(i)-(ii)

29 C.F.R. § 1630.2(j)(2)(i)-(iii) (2005)

29 C.F.R. § 1630.2(k)(2005)

29 C.F.R. § 1630.2(m) (2005)

29 C.F.R. § 1630.2(o)(3)

Cases

*Albertson's, Inc. v. Kirkingburg* , 527 U.S. 555, 566 (1999)

*Ammons v. Aramark Uniform Servs Inc*., 368 F.3d 809, 820 (7th Cir. 2004)

*Barnett v. U.S. Air, Inc*., 228 F.3d 1105 (9th Cir. 2000).

*Bartee v. Mielin N. Am, Inc.,* 374 F.3d 906, 916 (10th Cir. 2004)

*Branham v. Snow*, 392 F. 3d 896 (7th Cir. 2004)

*Calero-Cerezo v. US Dept. of Justice,* 355 F.3d 23 (1st Cir. 2004)

*Champ v. Baltimore County*, 884 F.Supp. 991, 996 (D.Md.1995)

*Childress v. Clement*, 5 F. Supp 2d 384 (E.D.Va., 1998)

*Cline v. Wal-Mart, Inc.,* 144 F.3d 294, 302 (4th Cir. 1998).

*Cravens v. Blue Cross & Blue Shield,* 214 F.3d 1011, 1021 (8th Cir. 2000)

*Crawford v. Union Carbide Corp et al.,* 1999 WL 1142346 (4th Cir. 1999)

*Deane v. Pocono Medical Center* 142 F.3d 138 (3rd Cir. 1998)

*Dillbeck v. Whirlpool Corp*., 2008 WL3819824 (S. D. Ind. 2008)

*Downs v. AOL Time Warner, Inc*., 2006 WL 6162563 (S.D. Ohio 2006)

*Doe v. University of Maryland Medical System Corp*., 50 F.3d 1261 (4th Cir. 1995)

*DuBerry v. District of Columbia*, 582 F. Supp 2d 27 (D. D.C. 2008)

*Edmonson v. Potter,* 2004 WL 2980716 (4th Cir. 2004).

*E.E.O.C. v. Browning-Ferris, Inc.*, 262 F. Supp. 2d 577, 584 (D.Md. 2002).

*EEOC v. R.J. Gallagher Co.,* 181 F.3d 645, 655 (5th Cir. 1999)

*E.E.O.C. v. Exxon Corp*., 124 F.Supp. 2d 987 (N.D.Tex., 2000)

*E.E.O.C. v. Federal Express Corp*., 513 F.3d 360 (4th Cir. 2008)

*Fiscus v. Wal-Mart Stores,* 385 F. 3d 378 (3d Cir. 2004)

*Fraser v. Goodale*, 342 F.3d 1032 (9th Cir. 2003)

*Gillon v. Fallon Ambulance Serv., Inc.,* 283 F. 3d 11 (1st Cir. 2002)

*Gonzales v. City of New Braunfels,* 176 F.3d 834 (5th Cir. 1999)

*Heiko v. Colombo Savings Bank*, 434 F. 3d 249 (4th Cir. 2006).

*Holiday v. City of Chattanooga*, 206 F.3d 637 (6th Cir. 2000)

*Hohider v. United Parcel Service, Inc*., 243 F.R.D. 147 (W.D.Pa.,2007)

*Hooven-Lewis v. Caldera,* 249 F.3d 259, 268 (4th Cir.2001)

*Jacques v. DiMarzio, Inc*., 200 F.Supp. 2d 151 (E.D.N.Y., 2002)

*Johnston v. Mid-Michigan Medical Center-Midland,* 2008 WL 82227 (E.D.Mich.,2008)

*Kammueller v. Loomis, Fargo & Co*., 383 F.3d 779, 785 (8th Cir. 2004)

*Kirkingburg v. Albertson's, Inc.,* 143 F.3d 1228 (9th Cir. 1998)

*Lawson v. CSX Transp., Inc.,* 245 F.3d 916 (7th Cir. 2001)

*Lennox v. Wal-mart Stores, LP,* 2008 WL 763740 (W.D. Pa.)

*McKenzie v. Dovala*, 242 F. 3d 967 (10th Cir. 2001)

*Mengine v. Runyon*, 114 F. 3d 415 (3d Cir. 1997)

*Rhoads v. F.D.I.C.,* 257 F.3d 373 (4th Cir. 2001)

*Robbins v. WXIX Raycom Media Inc.,* 2008 WL 650330 (S. D. Ohio 2008)

*Rodriguez v. ConAgra Gro*, 436 F.3d 468, 477-78 (5th Cir. 2006)

*Rohan v. Networks Pres., Prod. Co., LLC*, 375 F. 3d 266, 272 (4th Cir. 2004)

*School Board of Nassau Co. v. Arline*, 480 U.S. 273, 287 (1987)

*Stillwell v. Kansas City Bd. of Police Comm'rs,* 872 F.Supp. 682 (W.D.Mo. 1995)

*Taylor v. Hampton Roads Reg. Jail Auth*., 550 F. Supp. 2d 614, 617 (E.D. Va. 2008)

*Taylor v. Principal Fin. Group, Inc.,* 93 F.3d 155, 165 (5th Cir. 1996)

*Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 192 (3rd Cir. 1999)

*Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 197 (2002

*Walter v. United Airlines, Inc.,* 232,F.3d 892 (4th Cir. 2000)

*Weber v. Strippit, Inc.,* 186 F. 3d 907 (8th Cir. 1999)

*Williams v. Phila. Housing Auth. Police Dep't*, 380 F. 3d 751 (3rd Cir. 2004)

*Wilson v. Phoenix Specialty Mfg. Co., Inc.,* 513 F. 3d 378 (4th Cir. 2008)

*Zivkovic v. Southern Cal. Edison Co.,* 302 F.3d 1080, 1089 (9th Cir. 2002)

STATEMENT OF UNCONTESTED FACTS

1. James Hook had an excellent record for his performance as an Emergency Dispatcher at Prince George's County. Flaherty Dep., p. 21, ll. 7-16; p. 49, ll. 1-7; p. 222, ll. 9-13

2. During his tenure at the County before his 2007 illness, Mr. Hook was always monocular and from 1999 he had diabetes. *Aff. J. Hook*

3. No health issues or limitations, either from diabetes or from his vision, ever prevented Mr. Hook from being a high performer throughout his tenure through about February, 2007, when he became seriously ill and went off work. (See No. 1) *Aff. J. Hook*

4. In June, 2007 Mr. Hook was legally blind from diabetic retinopathy. His ophthalmologist, Dr. William Phillips, wrote a sick certificate for him which stated, " Pt. is legally blind from diabetic retinopathy in each eye." Ex. 1.

5. The legal blindness from diabetic retinopathy was not a permanent condition. Phillips Dep. p. 46, ll. 9-10. It means that vision is blocked by blood which has formed in the eye, and when the blood is cleared by a vitrectomy and visual acuity is restored, the person is no longer blind. Phillips Dep. p. 44-45 ll. 13-8.

6. In his letter to the County on January 4, 2008, Dr. Phillips reported that Mr. Hook had had the vitrectomy, his vision was stable, and his visual acuity was restored to 20/80 in the right eye. Ex. 11; Phillips Dep. p. 45, ll. 9-20.

7. Dr. Phillips' January 4, 2008 letter to the County reported that Jimmy was no longer blind, and it rescinded the previous diagnosis of legal blindness from diabetic retinopathy, which was no longer valid. Phillips Dep. p. 45-46, ll. 21-16.

8. Dr. Phillips stated that Jimmy should be able to meet the national standards for telecommunicators and should be able to do the job of Emergency Dispatcher. Phillips Dep. p. 52, ll. 1-21; p. 37, ll. 17-19. Ex. 11. Dr. Phillips also states that Jimmy's vision in his right eye is actually better than it was before. Phillips Dep. p. 42-43, ll. 18-6.

9. Jimmy's primary care physician, Dr. Rao, also stated that Jimmy could perform the job of Emergency Dispatcher on January 10, 2008. Ex. 6. Both Dr. Phillips and Dr. Rao understood the job duties when they released Jimmy to do the job. Ex. 8; Phillips Dep. p. 24 ll. 8-12; p. 31 ll. 7-13; p. 36 ll. 6-11.

10. Jimmy told his employer on December 10, 2007, that he had a disability, and asked for accommodation, assignment to a different job for which he was qualified and where he would be useful to the Department. Flaherty Dep. p. 18-19, ll. 14-1; p. 42-3, ll. 12-3; p. 222, ll. 7-13; Colbert Dep. p. 12, ll. 7-11.

11. Jimmy submitted all materials Defendant requested for evaluation of his fitness by the Medical Advisory Board. Colbert Dep. p. 10, ll. 7-12.

12. Defendant relied entirely on the decision of the Medical Advisory Board in their decision to terminate Jimmy. Herron Dep. p. 15, ll.5-8, 13-14; p. 13, ll. 6-8, 12-16; 13-14. Flaherty Dep. p. 49, ll. 8-13; p. 134-5, ll. 10-1.

13. Defendant's designee for the Medical Advisory Board states they found Jimmy unfit solely because a June, 2007 sick note stated he was legally blind and it had not been rescinded. Falik Dep. pp. 30, 33, 34, 36, 44-5, 54, 57

14. Before deciding to terminate Mr. Hook, the County did not have Jimmy examined, and did not consult with him or anyone else about what he actually could do, and made no effort to obtain more accurate information. Herron Dep. p. 27-28, ll. 9-3; p. 25-6, ll 20-17. Flaherty Dep. p. 139, ll. 7-17; p. 141, ll. 8-15; p. 142, ll. 4-13; p. 127, ll. 18-21. Falik Dep. p. 52, ll. 8-9.

15. Mr. Hook was not legally blind, as he was walking, driving, cooking, watching TV, reading and playing video games like a normal sighted person when he was terminated. *Aff. of T. Cooksey, D. Cooksey, T.D. Hang, J. Bickley, C. Kettenhofen.*

16. Defendant has admitted that they regarded Mr. Hook as having a permanent impairment substantially limiting a major life activity, and that they regard him as legally blind, based upon a record of legally blindness. Ex. 15: Termination Letter to Plaintiff; Falik Dep. p. 29, ll. 14-16; p. 30, ll. 18-20; p. 33, ll. 2-4, 19-20; p. 34, ll. 9-11; p. 36, ll. 4-6; p. 44, ll, 17-19; p. 45, ll. 11-12; p. 54, ll. 6-7; 57, ll. 9-10.

EXHIBITS

| | |
|---|---|
| Ex. 1 | “Sick Certificate” written by Dr. Phillips, June 5, 2007 |
| Ex. 2 | Drawing by Plaintiff, Fall 2007-Winter 2008 |
| Ex. 3 | Light Duty Releases from Dr. Rao and Dr. Phillips |
| Ex. 4 | June, 2007 Medical Note by Dr. Jyothi Raomahadevia (Dr. Rao) |
| Ex. 5 | November 1, 2007 Report by Medical Advisory Board |
| Ex. 6 | January 10, 2008 Medical Note by Dr. Rao |
| Ex. 7 | January 3, 2008 letter from County to Plaintiff |
| Ex. 8 | Affidavit and Report by Dr. Rao |
| Ex. 9 | Professional Qualifications for Telecommunicators |
| Ex. 10 | November 26, 2007 Letter of inquiry to Dr. Phillips from the County |
| Ex. 11 | January 4, 2008 Letter from Dr. William Phillips to Defendant |
| Ex. 12 | January 10, 2008 Report by Medical Advisory Board |
| Ex. 13 | February 7, 2008 Report by Medical Advisory Board |
| Ex. 14 | Plaintiff’s Rule 30(b)(6) Notice to Defendant |
| Ex. 15 | February 19, 2008 Letter of Termination to Plaintiff |
| Ex. 16 | Prince George’s County Personnel Law, Section 16-189(d) |
| Ex. 17 | Plaintiff’s Letter of Appeal to Defendant |
| Ex. 18 | Letter Rejecting Jimmy’s Appeal |

AFFIDAVITS

Affidavit of Joe Bickley

Affidavit of David Cooksey

Affidavit of Carolyn Kettenhofen

Affidavit of Toni Cooksey

Affidavit of Chief T. David Hang

Affidavit of Dr. William Phillips

Affidavit of James T. Hook

DEPOSITION EXCERPTS

Charlynn Flaherty Deposition

Dr. William Phillips Deposition

Dr. Joel Falik Deposition

Vernon Herron Deposition

Kathleen Colbert Deposition

BACKGROUND FACTS

Plaintiff James Hook ("Jimmy") knew he wanted to be a firefighter, as were his father and grandfather, as far back as he can remember. He signed on at age sixteen at the Berwin Heights Fire Department, and still serves as Deputy Fire Chief at Hyattsville Volunteer Fire Department. Hired by Defendant, Prince George's County Maryland Department of Homeland Security, Public Safety Communications ("the County"), in 1990 as an Emergency Dispatcher, Jimmy has worked there for eighteen years, rising through the ranks to become an Acting Supervisory Emergency Dispatcher IV. Also an EMT – an Emergency Medical Technician, Jimmy, age 43, has been dedicated to emergency operations his entire life. *Aff. James T. Hook.*

Jimmy's supervisor, Director of Public Safety Communications, Charlynn Flaherty, described Jimmy's job performance as "phenomenal" in deposition:

A. He was promoted up through the ranks to Assistant Operations Manager…I was very very reliant on him…He was crucial to the functionality and the transition of Public Safety Communications…. I relied on him very heavily, his advice and his knowledge.

Flaherty Dep. p. 21, ll. 7-16

A. He's a phenomenal dispatcher, a phenomenal dispatch supervisor, and we were willing to work with him to get him into that position...I will reiterate, he was a phenomenal employee.

Flaherty Dep. p. 49, ll. 1-7

Q. You'd be more than happy to have him return to work with you?

A. Absolutely. As I said before, he was a very talented employee, and an asset to the organization.

Flaherty Dep. p. 222, ll. 9-13

Jimmy's diabetes, diagnosed ten years ago, was clearly never an impediment at work. He arranged his eating, blood testing, and insulin injections so successfully that Jimmy's colleagues didn't

even know he had the condition. *Aff. J. Hook.* Ex. 1: *Affidavit and Report of Dr. Rao,*[1] *p. 3.* With his excellent job performance, it is clear that no visual limitations hindered him either. Since a childhood accident Jimmy had always been monocular, able to use only one eye at a time. Jimmy worked, drove, and read using one eye, almost always the right eye. He was not the only Emergency Dispatcher at the County who was monocular. Howard Ewing has also served there successfully for many years seeing with one eye. *Aff. J. Hook*

Serious Illness, Followed by Retinal Surgery

Falling gravely ill with pneumonia complicated by diabetes in February, 2007, Jimmy was hospitalized, unconscious, and in intensive care for about three months. So weak when he was released in about May, 2007, that he was in a wheelchair, it was through determination and grit that Jimmy pursued physical therapy and his own regime until, by fall he was working out for an hour each day in the gym, doing push-ups, sit-ups, and bench press, and walking one to two miles each day. [2]

During his illness with pneumonia, Jimmy suffered diabetic retinopathy, and when he was released from the hospital in May and June, 2007, he was temporarily legally blind. Ex. 1: June 5, 2007 Sick Certificate, The diabetes had caused tiny capillaries in the vitreous of his eye to become clouded with blood, and ophthalmologist, Dr. William Phillips, could not perform the surgery needed to clear his eyes until Jimmy was strong enough. On September 5, 2007, Dr. Phillips performed the procedures: a vitrectomy, which clears the blood from the vitreous, and laser surgery, to seal off the extra blood vessels. The surgery was successful in clearing Jimmy's vision, and the process actually improved his vision in that eye. Diabetic retinopathy was arrested, a gas bubble was inserted into his eye, and Jimmy's vision was stabilized and actually improved as compared to what it had been in the

---

[1] Jimmy's primary care physician, Dr. Jyothi Raomahadevia, is known as "Dr. Rao."
[2] "I basically had to learn everything all over again…..how to sit up, how to move, how to walk, how to talk…" *Aff. J. Hook*

past. Phillips Dep. p. 13; p. 15, ll. 19-22; p. 38, ll. 14-19; p. 42-43, ll. 13-6. Unfortunately, Jimmy did lose the sight in his left eye. But that left him, of course, in just the same condition as before, working, driving, and reading with his right eye, which was now somewhat better than before. *Aff. J. Hook.*

Within days after the successful surgery in September, 2007, Jimmy put the glasses he had always worn back on, and resumed the life of a normal sighted person. *Aff. J. Hook.* In February, 2008, when Defendant's Medical Advisory Board took the position that Jimmy was legally blind, Jimmy was driving his son to and from school and himself to the gym each day, as many witnesses describe. He walked around normally, cooked, watched TV, and read like a person with normal sight. *Affs. of Joe Bickley, David Cooksey, Carolyn Kettenhofen.* Jimmy's aunt, Toni Cooksey, at whose house Jimmy lived in winter of 2008, described that in January and February, 2008, she observed Jimmy "doing things that a normal person would do during the course of the day, without assistance of any kind (walking, playing with his son and dog, playing the guitar, using a computer and cell phone, reading writing and drawing, fixing meals, watching TV and playing video games.)" *Aff. Toni Cooksey.*

Throughout the fall and winter of 2007-2008, Jimmy was also spending up to 12 hours a day at his volunteer job, Deputy Fire Chief at the Hyattsville Volunteer Fire Department. He undertook a project reviewing and developing standard operating procedures for emergency operations at the Fire Department, reading and writing documents and manuals, and reviewing accidents and injury reports. He designed and presented a Power Point presentation explaining the detailed vehicle specifications and bidding proposals for the purchase of a new fire truck. *Affs. Chief T. David Hang, David Cooksey, J. Hook.* Not yet permitted to go back to work, Jimmy whiled away hours doing intricate detailed computer drawings of fire trucks. Ex. 2: Detailed Drawing by Plaintiff, Fall 2007-Winter 2008. By summer Jimmy was able to return to active riding status as a fireman where to this day he

directs rescues, putting out fires, getting people in blazing multi-story buildings to safety, and extricating victims trapped in mangled automobiles after horrific multi-car accidents. *Affs. Chief Hang, J. Hook.*

Jimmy's Employment Status

At the time Jimmy fell ill with pneumonia, he had been classified as a Communications Specialist at the County for about two years. He was a very experienced Emergency Dispatcher, however, and was detailed to work in that job in February, 2007. Throughout his illness Jimmy maintained his employment status with the County through accumulated leave and donated leave. In October, 2007, eager to get back to work, he asked to return for four hours a day, submitting medical releases from his primary care physician, Dr. Rao, and his retina specialist/ophthalmologist, Dr. William Phillips. Ex. 3:  Light Duty Releases.  Defendant would not allow the light duty schedule, but Defendant asked the County's Medical Advisory Board ("the Medical Board" or "Board") to do an evaluation of Jimmy's fitness for duty.

Medical Advisory Board Reviews Jimmy's Records

Meeting on November 1, 2007, the Medical Board reviewed the official qualifications for Emergency Dispatchers, the job descriptions for Communications Specialist and Emergency Dispatcher, and medical records going way back to when Jimmy had first emerged from a coma the previous spring. The records chronicled his release from the hospital, when he "couldn't sit or stand for more than five or ten minutes," his steady improvement over the following months, and in October, releases from his doctors to return to work on light duty. Ex. 3: Light Duty Releases. Ex. 4:  June 18, 2007 Medical Note by Dr. Rao.  Jimmy had been required to submit regular monthly absence excuses throughout, so his records included monthly notes from various physicians, going back to April, 2007. One of them, written on June 5, 2007 by Dr. Phillips, before the successful surgery in September, 2007

which cleared the diabetic retinopathy temporarily blocking Jimmy's vision, had stated, " Pt. is legally blind from diabetic retinopathy in each eye." Ex. 1: June 5, 2007 "Sick Certificate." ("It's what we'll give to a patient…to take back to usually their employer or school..." Phillips Dep. p. 18, ll. 10-13; "…it's just a little slip, yeah…a sick note." Colbert Dep. p. 19, l. 13).

The Board's report, after the November 1, 2007 review, stated that they wanted an update from Jimmy's retina specialist, Dr. Phillips, and they received that soon thereafter, releasing Jimmy to return to work. Ex. 5: November 1, 2007 Report by Medical Advisory Board The Board's report never mentioned any assumption that Jimmy was legally blind.

Instruction to Report and Request for Accommodation

On about December 3, 2007, Defendant instructed Jimmy to report back to regular work on December 10, 2007 - as a Communications Specialist. Flaherty Dep. p. 18, ll. 6-10. Although he would have no difficulty reading, writing, and working on a computer, the installation work performed by a Communications Specialist includes certain very close mechanical work which would be difficult for a monocular person to do, *Aff. Dr. Phillips,* and the work was also very physically demanding.[3] Although conscientiously regaining strength, Jimmy was not yet 100% recovered and he couldn't yet do strenuous labor. Ex. 6: January 10, 2008 Medical Note by Dr. Rao; Phillips Dep. p. 28, ll. 1-5. Jimmy requested a meeting with Director of Public Safety Communications, Charlynn Flaherty, and on December 10, 2007, he informed her that he had a disability, and was not physically able to do the Communications Specialist job. Jimmy asked for accommodation – assignment to another position, the sedentary Emergency Dispatcher job which Dr. Rao cleared him to perform, and which Jimmy had

[3] Defendant admits the Communications Specialist job consists of carrying 40 pound components around, crawling into car trunks, spending long periods working in that position, lying under vehicles to do installation and repair, climbing all around fire trucks to attach antennae. Flaherty Dep. p. 113-115.

performed in the past. Flaherty Dep. p. 18-19, ll. 14-1; p. 42-43, ll. 12-3; Colbert Dep. p. 11-12, ll. 15-11. Ex. 6: January 10, 2007 Note by Dr. Rao. This was a position for which Jimmy had outstanding skills, and one for which the County had a need.

Ms. Flaherty told Jimmy to get medical documentation explaining what job he could do.

Dr. Rao, Familiar with the Job, Released Jimmy to Emergency Dispatcher

In a letter to Jimmy on January 3, 2008, Defendant confirmed that the County had been informed that Jimmy had a disability, and they instructed him to provide the job descriptions for Communications Specialist and Emergency Dispatcher to his doctors to obtain medical documentation as to which job he could perform. Ex. 7: January 3, 2008 Letter from the County to Plaintiff. At a January 10, 2008 appointment with Jimmy, primary care physician, Dr. Rao, looked at the job descriptions, and talked with Jimmy about the Emergency Dispatcher duties, which, as he explained, consisted primarily of reading and working on a computer screen. Dr. Rao states in her sworn Affidavit, that she "was familiar with Mr. Hook's physical condition and his capabilities," that she had looked at the job descriptions, and she "was aware that an Emergency Dispatcher makes critical emergency decisions as part of the job." Ex. 8: Aff. and Report of Dr. Rao. It was Dr. Rao's decision that Jimmy should be released to work as Emergency Dispatcher without restriction, and she wrote the following for Jimmy's employer: "Above Patient is under my care…I believe he is physically unfit for the job requirements of Communications Specialist. He is able to perform a more sedentary job of Emergency Dispatcher." Ex. 6. [4]

[4] Dr. Falik testified in deposition that the limitations described in Dr. Rao's note were of no significance in the Board's decision. Falik Dep. p. 50-51, ll. 19-17. Where Jimmy had not yet regained full strength, Dr. Rao had set out current and temporary physical limitations in her medical note. ("Due to his extensive eye issues and marked water retention, fatigue and shortness of breath, I believe he is physically unfit for the job requirements of Communications Specialist.")

Dr. Phillips Knew the Job Requirements, Found Jimmy's Vision Sufficient

The National Fire Protection Association sets standards for the skills and abilities needed to be qualified as an Emergency Dispatcher. They include specific visual abilities, which the County incorporates as their requirement for Emergency Dispatchers, and which they set out in their publication titled Professional Qualification for Telecommunicators. That document states:

> Specific medical and physical abilities are required in order to perform essential functions of the job…..They include:
>
> > (2)*Sight.* Distinguish, differentiate, and respond to multiple visual stimuli such as printed documents, CRT display, and indicator lights.
>
> Ex. 9: Professional Qualification for Telecommunicators.

Confirming that this is the standard adopted by the County, Director Flaherty explained:

> It's the national standard for the NFPA for their recommendations, for abilities, for persons working, skill and abilities, as a fire and emergency telecommunicator. So it's what the National Fire Protection Association has established as a standard and it's the standard guidelines that we submit to the Office of Human Resource Management for our telecommunicators to meet the national standard.
>
> Flaherty Dep. p. 144-5 ll. 14-1

The County wrote to Jimmy's retina specialist, Dr. Phillips, on November 26, 2007 to ask whether Jimmy was qualified to be an Emergency Dispatcher. Quoting the national standard in their letter, the County asked Dr. Phillips, "Please confirm your opinion…that based on your examination of Mr. Hook's vision of 20/80 in the right eye…that he should be able to distinguish, differentiate, and respond to multiple visual stimuli such as printed documents, CRT display, and indicator lights." The County also enclosed the job descriptions for Communications Specialist and Emergency Dispatcher, asking the doctor whether Jimmy could perform those jobs. Nowhere did the County mention what they would later claim, that they considered Jimmy still to be blind, because Dr. Phillips had never "rescinded" a prior sick note. Ex. 10: November 26, 2007 Letter from County to Dr. Phillips

Dr. Phillips answered the County's questions in a letter on January 4, 2008. He stated without reservation that, "Mr. Hook should be able to perform the duties described with the right eye vision."[5] Dr. Phillips reported the vitrectomy surgery that Jimmy had had, that his vision was stable since that surgery, and that Jimmy's restored visual acuity was 20/80.[6] Ex. 11: Dr. Phillips' January 4, 2008 Letter

Dr. Phillips testified in deposition about the opinions he had provided to the County in the letter. Dr. Phillips stated that he knew that Jimmy would " be required to look at computer screens and input data into the computer from…multiple sources," he had looked at the duties of an Emergency Dispatcher listed on the job description, and he knew Jimmy would have to accurately relay information to emergency personnel to render medical assistance. Phillips Dep. p. 24 ll. 8-20; p. 31 ll. 7-13; p. 36 ll. 6-15. The doctor testified that when he wrote the January 4, 2008 letter, Jimmy had described: "…he would need to look at the monitor and things like that. And based on the vision of 20/80, I felt that he should be able to do that." Phillips Dep. p. 29, ll. 4-11. He testified that in his letter he had confirmed that Jimmy could "distinguish, differentiate, and respond to multiple visual stimuli such as printed documents, CRT display, and indicator lights, " and there was "no reason why he couldn't read and work on a computer." Phillips Dep. p. 51, ll.18 – p. 52 ll. 21. Dr. Phillips testified that the 20/80 level was fully adequate for the job, and he also noted in deposition that Jimmy's right eye vision had actually improved over the 20/80, and was in fact 20/60 following the 2007 surgery. Phillips Dep. p. 42-43, ll. 13-6.

---

[5] Phillips had also provided this information to Defendant in an earlier letter, dated November 6, 2007.
[6] Dr. Phillips referred to Jimmy's visual acuity as 20/80, which he considered to be fully adequate for the visual tasks, although he later described that Jimmy's acuity had actually improved from that level to 20/60.

Jimmy contacted the office of Administrator, Kathleen Colbert,[7] numerous times in December and January to confirm that Dr. Phillips had provided what had been required, and that the County had received everything they needed. Defendant admits Jimmy submitted everything that had been requested, and everything necessary – "what he reasonably should assume was necessary" - for him to get back to work. *Aff. J. Hook* ; Colbert Dep. p. 10-11, ll. 18-12; p. 11-12, ll. 15-11; p. 17-18, ll. 21-10.

The Medical Advisory Board Meets, then Reverses Itself

On January 10, 2008, the Medical Advisory Board met to consider Jimmy's fitness for duty. They reviewed all the records they had previously reviewed in November, along with the January 4, 2008 letter from Dr. Phillips, and the January 10, 2008 letter from Dr. Rao, both of which released Jimmy to work as Emergency Dispatcher. Ex. 6, 11. The Board decided as follows, "[I]t is the opinion of the Medical Advisory Board that Mr. Hook should be given an opportunity to perform the job of an Emergency Dispatcher." Ex. 12: January 10 Report by Medical Advisory Board. Defendant admits the Board was fully aware at this time that the job could involve processing life and death emergency calls. Falik Dep. p. 37, ll. 12-20. There was no mention in their report of a presumption that Jimmy was legally blind

In the weeks following, for reasons unknown, Defendant asked the Board to reconsider. On February 7, 2008, based upon the same information the Board had had on January 10, with no new records or evidence, and despite letters Dr. Rao and Dr. Phillips stating unequivocally that Jimmy could perform the necessary job duties of Emergency Dispatcher, the Board reversed with no explanation. "After reviewing all records, the Medical Advisory Board found that Mr. Hook is not fit

[7] Ms. Colbert, Retirement Administrator, handles all communication with Defendant's Medical Advisory Board, and also handles medical and absence records.

for duty and should seek disability retirement." Ex. 13: February 7, 2008 Report by Medical Advisory Board.

Defendant Relied Entirely upon the Board's Decision

Final decision maker Vernon Herron testified unequivocally that the "sole reason" they terminated Jimmy was the Medical Board's February 7, 2008 determination. "The only thing I relied on was the report from the Medical Advisory Board." Herron Dep. p. 15, ll.5-8, 13-14. Herron testified that he had no other information, looked at no other evidence, and he himself had no independent opinion. Herron Dep. p. 13, ll. 4-16. Director Flaherty, Jimmy's supervisor, also testified she relied entirely on the Medical Board, and that she formed no opinion whether or not Jimmy could do the job. (Q: "How could you form an opinion on whether or not he could do the job with or without accommodations…Did you form such an opinion?" A: "No" "We moved forward with termination" when "[t]he Medical Advisory Board determined he was unfit…"). Flaherty Dep. p. 49, ll. 8-19; p. 134-5, ll. 10-1; p. 135-6, ll. 14- 1.

Defendant's Explanation for the Board's Determination

The explanation why the Medical Board found Jimmy to be unfit was provided by Dr. Joel Falik, Chairman of the Medical Advisory Board, in deposition pursuant to Plaintiff's Rule 30(b)(6) Notice to Defendant to produce a designee to explain the medical decision by the Board. Ex. 14: Plaintiff's Rule 30(b)(6) Notice to Defendant

Dr. Falik testified that the Board's position was that Jimmy was still legally blind, and that the Board made the February 7, 2008 determination solely and simply because of the one sentence note Dr. Phillips had written eight months earlier to excuse Jimmy from work which stated, " Pt. is legally blind from diabetic retinopathy in each eye." The June 5, 2007, sick certificate had been written at around the time Jimmy first became conscious; four months before Jimmy's surgical vitrectomy, the

standard treatment for diabetic retinopathy which successfully removed the fluids blocking his vision; and eight months before Dr. Rao and Dr. Phillips submitted detailed explanations stating unequivocally that Jimmy was able to do the job.

Dr. Falik was asked at deposition about the questions the County had asked Dr. Phillips - whether Jimmy could meet the National Fire Protection Association visual standards for Emergency Dispatcher, and do the job, and about Dr. Phillips' response affirming that he could.

In deposition Dr. Falik admitted that the visual tasks enumerated in the County's inquiry to Dr. Phillips, "distinguish, differentiate, and respond to multiple visual stimuli such as printed documents, CRT display, and indicator lights" were what was required to perform the Emergency Dispatcher job.[8] He admitted that Dr. Phillips found Jimmy able to perform those tasks.[9] He admitted that Dr. Phillips had okayed Jimmy to return to work as an Emergency Dispatcher. [10] Dr. Falik stated that he "accepted" the opinion of Dr. Phillips, the specialist who had the most knowledge about Jimmy's vision, about whether Jimmy could do the job. [11] ("…this is an ophthalmologist who made the decision and we don't question that." Falik Dep. p. 26, ll. 7-8).

---

[8] Q: Well, if you do the things in the letter, distinguish, differentiate and respond to multiple visual stimuli, such as printed documents, CRT display, and indicator, if you could do those things, isn't that what would be required of the emergency dispatcher? A: "It is – yes…." Falik Dep. p. 32, ll. 9-15.

[9] Q: "But he – Dr. Phillips had been specifically asked whether Mr. Hook was able [to do the visual tasks] and the doctor had said yes, he was able to do that; isn't that right?" A: "That's correct." Falik Dep. p. 29, ll. 1-8

[10] Q:"But he was okaying him to go back to work, wasn't he, in this letter?" A: "That's the statement he made based on that report." Falik Dep. p. 29, ll. 12-15.

[11] "And you felt that the evidence that the ophthalmologist or the specialist most familiar with his visual situation, that what he said about Mr. Hook's ability to do the job, was not reliable?" Dr. Falik stated, "No. I accept what he said." Falik Dep. p. 44, ll. 8-16. "this is an ophthalmologist who made the decision and we don't question that." Falik Dep. p. 26, ll. 7-8.

But according to Dr. Falik, the Board was still justified in finding Jimmy unfit. Dr. Phillips hadn't added into his description of Jimmy's treatment and abilities, that Jimmy was no longer blind. Dr. Phillips had found that Jimmy could meet the required national visual standards that had been set out, and could do the job, but Dr. Falik insisted: "That's correct ….But…he did not say…that Mr. Hook was not legally blind." Falik Dep. p. 29, ll. 8-11.

With each and every answer Dr. Falik, repeated, at least twelve times, the Board's position that Jimmy was still blind, repeating the argument that the June, 2007 sick certificate had never been rescinded. [12] Falik testified: "We had a diagnosis of legal blindness, and that's what <u>we chose</u>." Falik Dep. p. 29, ll. 19-21 *(emphasis added)*. The "diagnosis" had been of no concern when the Board first decided in January, 2008 to give Mr. Hook "an opportunity to perform the job of an Emergency Dispatcher," it was not mentioned in the Board's February 7, 2008 report, and appears never to have been mentioned until the March 16, 2010 deposition.

<u>Dr. Falik Could Not Explain His Position: He is "not an ophthalmologist."</u>

Asked by Counsel - "Are you trying to tell me that you can be legally blind and still able to do all those things that I described?" - Falik had no explanation. Falik Dep. p. 32-3, ll. 19-4. Nor could he explain how Jimmy could be blind, when he is able to "drive a fire truck on emergency operations, able to pull people out of mangled cars in horrific accidents…he drives and reads every day all day, you still maintain that he is legally blind?" Falik Dep. p. 45-6, ll. 17-9.

Asked, "Given the fact that he's been…from say September 2007 through the present, that he's able to do every visual function in normal life….isn't it quite possible that his legal blindness diagnosed in June '07, was no longer correct?" Falik answered, "Counselor, I'm not an

[12] Falik Dep. p. 29, ll. 14-16; p. 30, ll. 18-20; p. 33, ll. 2-4, 19-20; p. 34, ll. 9-11; p. 36, ll. 4-6; p. 44, ll, 17-19; p. 45, ll. 11-12; p. 54, ll. 6-7; 57, ll. 9-10.

ophthalmologist. I can't answer that." Falik Dep., p. 58-9, ll. 4-4. Regarding Dr. Phillips' statement that Jimmy could meet the National Fire Protection Association's visual requirements, Dr. Falik was asked whether the prior diagnosis of blindness "conflicted with Dr. Phillips' opinion that he – Mr. Hook could do the job, isn't there a conflict there?" He responded, " I can't answer that, Counselor…I'm not an ophthalmologist." Falik Dep. p. 59, ll. 14-19. Asked whether: "Q: Legal blindness is never temporary, never something that changes…?" Falik said, "I'm not an ophthalmologist. I'm not answering questions in that area." Falik Dep. p. 59, ll. 1-4.

Dr. Falik didn't disagree that the evidence was contradictory, but his position was that the Board didn't need further information because they had the diagnosis from June, 2007, from before Jimmy's surgery. When asked: "So you wanted something else more current from the ophthalmologist," Falik replied,"I didn't want anything." Falik Dep. p. 46, ll. 10-12. Asked, "And you didn't – in receiving the letter from the ophthalmologist who's saying that Mr. Hook was able to do the duties described, you had no interest in finding out – if you didn't believe that – that was self-explanatory…. you had no interest in finding out what he meant?" Falik answered: ¨Well, that is correct" Falik Dep. p. 57, ll. 1-7.

Dr. Phillips' Testimony

Jimmy's ophthalmologist, Dr. Phillips confirmed in deposition what he had said in the January 4, 2008 letter: that "based on the vision of 20/80," in the right eye, Jimmy could do the job. He said he had looked at the job description and knew the emergency nature of the duties. At acuity of 20/80, Dr. Phillips testified, "The vision had improved to the point where he should be able to see to work." Phillips Dep. p. 29 ll. 10-11; p. 37 ll. 17-19. Dr. Phillips also confirmed that "the fact that he is monocular is not an impediment at all to his ability to read and work on a computer." Phillips Dep. p. 44 ll. 7-12. But Dr. Phillips also explained during the deposition that Jimmy's right eye vision had

actually improved to 20/60. It was better than it had been in the past, when Jimmy had had no difficulty doing the job well. Dr. Phillips explained:

> We were able to treat the bleeding and the swelling. We got his vision improved to 20/60, which for pretty much any job you wouldn't be able to not let someone work…But based on seeing patients daily, and what patients are able to do with a vision of 20/60…there aren't many things you wouldn't be able to do with vision 20/60.
>
> Dr. Phillips Dep. p. 38, ll. 16-19; p. 39, ll. 2-11

<u>Dr. Phillips' June, 2007 Sick Certificate had been Rescinded</u>

Dr. Phillips explained that in the June 5, 2007 sick note he had reported legal blindness from diabetic retinopathy, a condition that specifically means blindness from blood in the eye. The condition affects only visual acuity. It was a condition that was not permanent. Dr. Phillips explained that where the vitrectomy had been performed, the blood cleared, and visual acuity restored to 20/80, as set out in Dr. Phillips' January 4, 2008 letter, the patient could no longer be legally blind. Phillips Dep. p. 44, ll. 13 – p. 46, ll. 16. Dr. Phillips explained that no other visual problems other than the visual acuity which had been restored were implicated in his original note that Jimmy had been legally blind for a time. Phillips Dep. p. 39, ll. 12-17. He also stated that the ability to work on a computer is mostly a matter of visual acuity. Phillips Dep. p. 43, ll. 7-10.

Asked, "So basically your January 4 letter essentially rescinded the older June sick note that said he was legally blind?" Dr. Phillips answered "Correct." Phillips Dep. p. 45, ll. 21 – p. 46, ll. 4. He explained:

> Q: Your January 4 letter indicates that that old June 5, '07 note is no long valid…?
>
> A: Well, yeah, it no longer comes into play, because it wasn't a permanent condition…So, yeah, it's updating his status and certainly as of the January 4 letter at 20/80, he's not legally blind."
>
> Phillips Dep. p. 46, ll. 6-16

Dr. Phillips was also asked about "rescinding" prior sick notes. Q: "When you're asked to okay someone to come back to work and you're asked if they can do the job, would you normally go back and find the old sick notes you had written and formally rescind those old diagnoses that were no longer valid, or would you just tell what the patient could do now?" He answered, "We usually just do what their current status is." Dr. Phillips was also of the opinion that most doctors would not go back to rescind prior sick notes, but would just provide the current condition. "So I don't think you actually go to the trouble of going back per se," except in the case of a contagious disease. Phillips Dep. pp. 46-47, ll. 17 – 15. Administrator Kathleen Colbert agreed in deposition that when an employee has been out due to illness, doctors have not been required by the County to go back and rescind prior sick notes: they simply send another note describing the employee's present condition and whether he can work or not. "No. They don't normally rescind anything." Colbert Dep. p. 20, ll. 7-12; p. 21, ll. 8-13.

Dr. Phillips' letter had ended with, " If you have any further questions or concerns, please do not hesitate to contact me," and he testified he had been willing to provide any further information the County needed. Phillips Dep. p. 47-48 ll. 20-2; Ex. 11. No one at the County inquired any further.

<u>No Individualized Assessment of Jimmy's Limitations</u>

There was never any individual assessment to see whether Jimmy could do the Emergency Dispatcher job before he was terminated, testified decision-maker, Vernon Herron, who said he didn't instruct anyone to do such an assessment. Herron Dep. p. 27-28, ll. 9-3. Herron testified that he had no idea at all what issues there might be with Jimmy's vision. Herron Dep. p. 25-6, ll 20-18. Director Flaherty testified she never talked to Jimmy or to anyone else about his limitations; she didn't know the extent of any vision issues; she didn't do anything to try to get more information; and she generally didn't have enough information to form an opinion whether or not Jimmy could do the job. Flaherty

Dep. p. 139, ll. 7-17;  p. 141, ll. 8-15; p. 142, ll. 4-13; p. 127-128, ll. 18-5.  Dr. Falik, asked whether he had sought specific information, responded, "Of course not. We hadn't – of course not.  Why would we?" Falik Dep. p. 52, ll. 8-9. [13]

Jimmy's disclosure to Defendant that he had a disability and required an accommodation had prompted no conversations with Jimmy at all, about what he could or could not do.  Colbert Dep. p. 12-13, ll. 12-3.  Defendant's Medical Board designee, and all of the County's management officials deposed testified that no one compared the essential functions of the job with what Mr. Hook could and couldn't do; no one examined him; no one sent him for an independent exam; no one consulted his doctors; no one interviewed Jimmy; and no one made any effort at all to clarify or obtain further information on the status of Jimmy's vision.  Falik Dep. p. 47, ll. 2 – p. 49, ll. 16;  Flaherty Dep. p. 141, ll. 8 – p. 143, ll.12; Herron Dep. p. 24, ll. 2-14; p. 27, ll. 9-13; p. 28, ll. 1-3; Colbert Dep. p. 14, ll. 1-5; pp. 15-17, ll. 20-9. [14]

Jimmy had no way to know of the flagrant misperceptions which were swirling through the administrative process.  *Aff. J. Hook.*   He had submitted the medical releases  requested, following up with calls to ensure that everything was in order.  He had no way of knowing that the Board was confused based upon a condition reported long ago during his illness.  Jimmy had done everything " he reasonably should have assumed  was necessary" to get back to work,  Colbert Dep. p. 10, ll. 18 – p. 11, ll. 12,  and he fully believed he would soon be back at his job.

---

[13] Retirement Administrator Colbert testified that the Board could and where appropriate should ask for clarification of any confusing or contradictory issues, but they did not. Colbert Dep., p. 15, ll. 7-16.
[14] Director of Pubic Safety Communications Flaherty, Deputy Chief Administrative Officer and final decision-maker Vernon Herron, and Retirement Administrator Kathleen Colbert were the officials deposed.

Termination Based upon Substantially Limiting Impairment

After the Medical Board's determination, decision-maker Vernon Herron wrote Jimmy on February 19, 2008, that he had been found unfit for duty and would be terminated. The letter included the legal basis for the County's decision, which was "… in accordance with the authority granted to me by the Prince George's County Personnel Law, Section 16-189(d) "Separation-Disability."" Ex. 15: February 19, 2008 Letter from County to Plaintiff. According to Prince George's County Personnel Law, Section 16-189(d), termination is permitted under that provision where there is a determination that "the employee has a permanent impairment that substantially limits a major life activity." [15] Ex. 16: Prince George's County Personnel Law, Section 16-189(d) (*emphasis added)*

Director of Public Safety Communications, Charlynn Flaherty, testified that Defendant's position was that Personnel Law, Section 16-189(d) was properly applied to Jimmy:

Q. And it [also] requires that the results indicate that the employee had a permanent impairment that substantially limits a major life activity; isn't that right?

A. That's what it says.

Q: "So he was properly terminated under 16-189 D; isn't that right?...Because it applies to his situation; isn't that right"

"A: "Yes."

Flaherty Dep. p. 167 ll. 13-17; p. 168 ll. 1-18

[15] In it's entirety, Section 16-189(d) provides: "Where any such employee undergoes a medical examination and the results thereof indicate that the employee has a permanent impairment that substantially limits a major life activity and the employee will not be able to continue to satisfactorily perform the normal duties, tasks, and responsibilities of the position the employee occupies [he may be transferred or terminated]." Prince George's County Personnel Law, 16-189(d) Ex. 16.

Appeal Denied

Jimmy filed an appeal, Ex. 17: February 29, 2008 Letter of Appeal ,[16] which was rejected on March 10, 2008. Ex. 18: Letter Rejecting Jimmy's Appeal.

JIMMY'S DISABILITY - DIABETES

Jimmy, an outstanding performer who is ready and eager to return to his job, was diagnosed in 1999 with diabetes, an incurable disease of the endocrine system. Diabetes is a malfunction of the body's ability to metabolize food, and because of the disorder Jimmy's body could not, on its own, properly process what he ate and turn that food into energy. Normally when food is ingested, the body turns the carbohydrates into glucose which is carried through blood vessels to the cells of the body. Where the endocrine system is working properly the glucose is absorbed by the body cells and converted to energy, needed for every human activity, from pumping blood to thinking to running and jumping. Insulin, a hormone produced by the pancreas, is what enables the cells to absorb the glucose. It is insulin that is the key, unlocking the microscopic doors that allow glucose to enter the cells. Without sufficient insulin the body cannot process, or metabolize the food we must eat to live.

As a diabetic Jimmy's body was not able to make or use sufficient insulin. Therefore his body could not, as in a normal person, properly absorb and process the glucose into energy. Where the normal body orchestrates and regulates the flow of sugar into the cells on its own, for Jimmy, as a diabetic, the sugar simply accumulated in his bloodstream. The body is not designed to cope with these great amounts of sugar, and the high sugar levels can cause life threatening damage to the

[16] In his appeal, Jimmy explained that he was fully able to view computer screens and printed materials with his right eye, that another Emergency Dispatcher who is monocular was doing the same job, and that any weakness he still experienced was temporary and would not affect his ability to perform the Emergency Dispatcher job.

circulatory system, the kidneys, and the eyes, and the nervous system.  That is the serious danger of

being a diabetic, and such damage eventually did occur in Jimmy's case.[17]

Proper diet is a tool for managing the elevated blood sugar levels caused by diabetes.  As a

diabetic, in his efforts to regulate his blood sugar levels, Jimmy had to follow a perpetual, restrictive

and very demanding regimen related to his food intake:  planning, having on hand, and eating meals

totaling about 1800 calories, appropriately spaced, six times a day.   Each day's schedule had to be

organized around the required meals.  Especially when away from home, at work or engaged in other

activity, Jimmy had to be sure that he would have the proper food available, and in the proper amounts.

For Jimmy, however, as for many people with diabetes, this complex eating regimen was not

sufficient to successfully regulate his glucose level.  He also had to give himself injections of insulin

four times a day to prevent dangerous accumulations of blood sugar.  Neither the insulin injections nor

diet could be relied upon to adequately regulate his blood sugar.  He was also required to do six blood

tests each day, repeatedly pricking his finger to determine his glucose level, so that he could monitor

constant changes and identify the adjustments that had to be made.

For Jimmy, as for diabetics generally, there was also the constant threat that his blood sugar

level could actually become dangerously low.   Low blood glucose levels, or hypoglycemia, can be

caused by taking too much insulin, delaying or skipping a meal, or engaging in unexpected exercise, so

that too much sugar crosses the cell membranes.  If the insulin does its job too well,  blood sugar level

begins to decrease, and the brain becomes starved for glucose.  Without prompt treatment convulsions,

coma, and death can result.

---

[17] Exhibit 8, *Affidavit and Report of Dr. Jyothi Raomahadevia;* JANET NORWOOD & CHARLES INLANDER, UNDERSTANDING DIABETES,  (1999),  pp. 1-7; MARIA COLLAZO-CLABELL, MD. Ed., MAYO CLINIC ON MANAGING DIABETES, pp. 5-25 (2001);  Arent and Dimmick, *Background Materials on Diabetes*, (American Diabetes Assoc., 2007) pp. 1-5; .

In managing his diabetes, Mr. Hook had to walk on a life-sustaining tightrope, balancing the serious risks of low blood glucose levels and high blood glucose levels, balancing his insulin injections, his diet, and his activity level vigilantly. No matter how carefully Jimmy monitored these variables, there was no way that Jimmy's endocrine system could attain glucose control that was comparable or as good as what the body of a normal person can attain naturally. [18]

Consequences of Diabetes - Impaired Immune System and Pneumonia

The restrictions of the rigid regime described above were but a small part of the problems Jimmy encountered from his diabetes. The years of diabetes and high glucose levels can wreak havoc on the body, and the high glucose levels led to other substantially limiting and in fact life threatening complications.

The diabetes was damaging to Jimmy's immune system. Diabetics have increased susceptibility for pneumonia, and Jimmy's diabetes impaired his ability to fight off the infection in February, 2007. [19] Once having contracted pneumonia, Jimmy, as a diabetic with poor glycemic control, had an increased likelihood of complications related to pneumonia and there was an increased likelihood he would require hospitalization, as he in fact did.[20]

Jimmy's diabetes made him not only more susceptible to the pneumonia infection, but once contracted, as a diabetic he had a worse prognosis. [21] Death rates after admission to the hospital for

---

[18] Exhibit 8, *Affidavit and Report of Dr. Jyothi Raomahedevia;* Arent and Dimmick, *Background Materials on Diabetes*, (American Diabetes Assoc., 2007) pp. 1-5; NORWOOD & INLANDER, *supra, at 106-108;* COLLAZO-CLAVELL, *supra, at 22-23.*

[19] COLLAZO-CLAVELL, *supra, at 32.*

[20] Jette B. Kornum MD, *Diabetes, Glycemic Controal, and Risk of Hospitalization with Pneumonia,* (Diabetes Care, August 2008 31:1541-1545). This study also found pneumonia death rates were higher in diabetics than in non-diabetic patients.

[21] Kornum, *supra;* Dimmick and Hathaway, *Proving Diabetes is a Disability*, (American Diabetes Association), p. 5; Kornum, *supra.*

pneumonia are higher in diabetics than in non-diabetics.[22] In fact Jimmy was in intensive care for over three months, and at one point was given last rites. He was released in about May, 2007, but the effect of diabetes on his immune system is a continuing substantial limitation of a major life function.

Jimmy was released from the hospital in about May, 2007. In a wheelchair, unable to sit or stand for more than 5-10 minutes, through physical therapy over the next few months Jimmy worked to learn to move, walk, and talk again. In addition, upon his release, Jimmy had to deal with another devastating problem: he was legally blind because of the effects of proliferative diabetic retinopathy. From the retinopathy he lost sight permanently in one eye, and temporarily in both. *Aff. J. Hook.*

Consequences of the Diabetes – Diabetic Retinopathy

Diabetic retinopathy is a complication of diabetes which results from damage to the blood vessels in the retina, the light-sensitive tissue at the back of the eye. For Jimmy, as a diabetic, where his body didn't use glucose properly and where high levels of blood sugar sometimes built up, eventually the tiny blood vessels, capillaries that nourish the retina, were damaged. In proliferative diabetic retinopathy, the most severe type, and the type Jimmy had, abnormal blood vessels grow in the retina. The new blood vessels leak into the clear, jelly-like substance that fills the center of the eye, the vitreous, and blood fills the vitreous cavity. In some cases, as in his, eventually all vision was blocked. In addition, if the new blood vessels interfere with the normal flow of fluid out of the eye pressure builds up, and can result in loss of vision from glaucoma. When Jimmy was discharged from the hospital, proliferative diabetic retinopathy and glaucoma had rendered him unable to see. This condition was corrected in his right eye.

Proliferative diabetic retinopathy can be, and was treated in Jimmy's case, with a surgical procedure called vitrectomy. In a vitrectomy, the surgeon removes blood with delicate instruments

[22] Kornum, *supra.*

from the vitreous, along with any scar tissue pulling on the retina, replacing them with a salt solution or a gas bubble. Laser treatment also treated the abnormal blood vessels and scars are treated with laser burns. [23]

Fortunately, in fall of 2007, the vitrectomy and laser surgery by Dr. William Phillips, Jimmy's ophthalmologist and retina specialist, restored sight to Jimmy's right eye. Phillips Dep. pp. 12-16. Thus, he is no longer legally blind, but his vision was not fully restored either. The progress of the diabetic retainopathy was arrested, his vision is well stabilized, and he can readily perform the duties of Emergency Dispatcher with the vision in his right eye, as Dr. Phillips attests. Phillips Dep. p. 44, ll. 7-12. But he no longer has any sight in his left eye, which will never improve, and he no longer has any depth perception. Diabetes and diabetic retinopathy are life long conditions, and Jimmy continues to be substantially limited in seeing because of the effects of proliferative diabetic retinopathy.

<u>Consequences of the Diabetes - Kidney Failure</u>

In January, 2008, Jimmy had regained strength and was ready and eager to return to work. But in late fall, 2007, there was a decline in his kidney functioning. During the winter of 2008 Jimmy's system actually improved in its ability to produce and manufacture insulin on its own, but in about December, 2007, after ten years of high blood sugar from diabetes, hospital tests revealed that Jimmy's kidneys were operating at only 17% of capacity. By spring, 2008, Jimmy had serious kidney failure which soon resulted in the need to have dialysis. *Aff. J. Hook.*

In a normal person, tiny filtering structures within the kidneys perform a continuous filtering function, moving toxins from the blood into urine. The same high blood sugar level that caused damage to the capillaries of the retina can also damage the small delicate blood vessels that nourish

---

[23] AMERICAN DIABETES ASSOCIATION, *Diabetic Care,* January, 2004, Vol. 27, 84-87; NORWOOD & INLANDER, *supra, at 119-124*; COLLAZO-CLAVELL, *supra, at 29-30;* Mayo Clinic website, <*<u>http://www.MayoClinic.com</u>*> National Institutes of Health Eye Institute website, <*<u>http://www.nei.nih.gov/health/diabetic/retinopathy.asp</u>*,>

these filtering structures in the kidneys. For Jimmy, as for many long term diabetics, overwork damaged the blood cleansing filtering system, the kidneys lost their filtering ability, and waste products began to build up in his blood.[24] By January, 2008, Jimmy's kidney function had dramatically declined, and he now has end stage renal disease.

In end stage renal disease, the kidneys are virtually inoperative. Although he does not experience debilitating side effects, Jimmy spends twelve hours each week attached to a dialysis machine which removes toxins from his blood.

**ANALYSIS**

To establish discrimination on the basis of disability and a violation of the Americans with Disabilities Act ("ADA"), Plaintiff must prove three elements: (I) that he has a disability, (II) that he was qualified for the position with or without accommodation, (III) that he was excluded from the position on the basis of the disability. *Doe v. University of Maryland Medical System Corp.,* 50 F.3d 1261, 1264-5 (4th Cir. 1995).

I. PLAINTIFF CAN ESTABLISH THE FIRST ELEMENT

For purposes of the ADA, the first element, a disability, is "a physical or mental impairment that substantially limits one or more of the major life activities of an individual." 42 U.S.C. § 12102(2). If a plaintiff has an impairment meeting that definition - if he has an impairment that substantially limits one or more of his major life activities - he has an actual disability for purposes of the statute, and he is protected by the ADA. As later explained herein, where an employer regards the plaintiff as having such an impairment, or acts upon a record of such an impairment, the plaintiff is similarly protected.

[24] AMERICAN DIABETES ASSOC. , COMPLETE GUIDE TO DIABETES, 4th ed. (2005).

The disability required in the first element is itself defined in a three part test. Plaintiff must show (1) that he has a physical or mental impairment (2) that the impairment implicates at least one major life activity, and (3) that the limitation is substantial. 42 U.S.C. § 12102(2). Plaintiff has such an actual disability – diabetes.

<u>DIABETES AND ITS CONSEQUENCES</u>

Diabetes is a physical impairment for purposes of the ADA. 29 C.F.R. § 1630.2(h)(1) (2005); *Gonzales v. City of New Braunfels*. 176 F.3d 834, 837 (5th Cir. 1999) (describing diabetes as a "serious impairment"); *Fraser v. Goodale,* 342 F.3d 1032, 1038 (9th Cir. 2003); *Lawson v. CSX Transp., Inc*., 245 F.3d 916, 923 (7th Cir. 2001). According to the second and third prongs, the impairment must limit major life activities, "those activities that are of central importance to daily life." *Toyota Motor Mfg., Kentucky, Inc. v. Williams,* 534 U.S. 184, 197 (2002). The limitation on major life activities must also be substantial. *Toyota Motor Mfg., supra, at 185.*

The determination of substantial limitation is to be made on a case-by-case basis. 29 C.F.R. Part 1630 App. (2005). Whether an impairment is substantially limiting depends on the effect it has on the individual's life, as compared to the life of an average person in the general population. 29 C.F.R. § 1630.2 (j)(1)(i)-(ii); *Rohan v. Networks Pres., LLC,* 375 F. 3d 266, 272 (4th Cir. 2004). Here, plaintiff's diabetes, retinopathy and kidney disease result in substantial limitations in the major life activities of eating, seeing, and eliminating waste. Each of these activities will be addressed in turn.

<u>Substantial Limitation in Eating</u>

Jimmy's diabetes caused a substantial limitation in the major life activity of eating because of the burdens placed on him by his treatment regimen. He could only manage his diabetes through a rigid and life altering system of schedules, eating strictly controlled meals six times a day, injecting himself with insulin four times a day, and constantly monitoring his glucose level through blood

glucose testing, so that the necessary adjustments could constantly be made. Eating has been recognized by numerous courts as a major life activity. *Lawson v. CSX Transp., Inc*., 245 F.3d 916 (7th Cir. 2001); *Weber v. Strippit, Inc*., 186 F. 3d 907 (8th Cir. 1999); *E.E.O.C. v. Browning-Ferris, Inc.,* 262 F. Supp. 2d 577, 584 (D.Md. 2002). Jimmy was not merely dieting to lose weight or watching what he eats to improve his general health; he had to strictly control and schedule his food intake and balance food with exercise and insulin in order to prevent serious short and long term health complications. Jimmy's limitations on eating are similar, if not identical, to those found to constitute a disability by numerous other courts. See, e.g., *Lawson, supra,* 245 F. 3d at 922 (plaintiff was substantially limited in eating because of his need to carefully monitor his blood glucose level, insulin dosages, and eating habits and because he "cannot simply eat when and where he wants to, or exert himself without concern for the effect the exertion will have on his glucose levels . . . [Instead, he] must always concern himself with the availability of food, the timing of when he eats, and the type and quantity of food he eats"); *Branham v. Snow*, 392 F. 3d 896 (7th Cir. 2004) (finding a substantial limitation in eating based on the need to tie dietary intake with precision to blood glucose readings and the inability to eat what and when he pleases because of the risks of short and long term complications); *DuBerry v. District of Columbia,* 582 F. Supp. 2d 27 (D.D.C. 2008) (plaintiff could show he was substantially limited in eating because of his need for a strict eating and blood glucose monitoring schedule to prevent diabetes complications); *Robbins v. WXIX Raycom Media Inc.*, 2008 WL 650330 (S. D. Ohio 2008) (plaintiff with type 2 diabetes did not need to show that she used insulin or had past incidents of hypoglycemia in order to be disabled; she survived summary judgment by showing her need to eat at regular times, inability to skip meals, and the need to frequently monitor her blood glucose levels); *Downs v. AOL Time Warner, Inc*., 2006 WL 6162563 (S.D. Ohio 2006) (plaintiff who has type 2 diabetes treated with oral medications but not insulin survived summary

judgment on whether he was substantially limited in eating based on evidence that he needed to eat at specified times to manage his blood glucose levels). Jimmy has presented more than sufficient evidence to show that his diabetes substantially limited his ability to eat.

Controlling proper blood glucose levels was especially urgent for Jimmy where he had diabetic retinopathy. The major life activities of seeing, and also eliminating waste have been impacted by the abnormal levels. These additional substantial limitations separately qualify him for ADA coverage, and under the ADA, multiple impairments taken together constitute an impairment. 29 C.F.R. Part 1630 App. (2005).

Jimmy's Impaired Endocrine System is Substantially Limiting

Jimmy's diabetes, and his weakened immune system put him at risk for the pneumonia he contracted in February, 2007. Once he had the infection, with diabetes he had a diminished ability to recover,[25] and he spent months unconscious in intensive care, from February through about May, 2007. When Jimmy recovered, he was so weak he was in a wheelchair, but through determination and grit he gradually regained his strength. The diabetes led to Jimmy's almost complete inability to care for himself for many months, and diabetes continues to enhance risk for future infection.

Jimmy's Diabetic Retinopathy Substantially Limits His Ability to See

Jimmy's diabetic retinopathy was also a result of his diabetes. Diabetic retinopathy is the leading cause of new cases of blindness in American adults. With individuals who have had diabetes as long as Jimmy, many patients develop the condition he developed, where the years of elevated blood sugar levels have caused abnormal blood vessels to grow in the retina. [26]

---

[25] COLLAZO-CLAVELL, *supra, at 32*; Jette B. Kornum, *supra.*

[26] National Institutes of Health, Eye Institute, <*http://www.MayoClinic.com*>
< *http://www.nei.nih.gov/health/diabetic/retinopathy.asp* >

As described above, the abnormal vessels leak blood into the vitreous cavity blocking vision, and glaucoma often, and did in this case, result from interference with the flow of fluid out of the eye. When first diagnosed with retinopathy, following his bout with pneumonia, Jimmy had lost all vision and was blind in both eyes. When Jimmy was strong enough, several months after his release from the hospital, surgery removed the blood and treated the scar tissue. Jimmy regained sight in his right eye, but permanently lost all sight in his left eye.

The years of high glucose levels from the inadequately functioning endocrine system take their toll, and the effects of retinopathy caused a substantial limitation in Jimmy's ability to see. Jimmy must be ever vigilant to minimize the risks of further retinopathy, although the retinopathy is presently controlled, his vision stabilized, and blood sugar now at more acceptable levels.

Jimmy's Kidney Disease Substantially Limits His Ability to Eliminate Waste

Jimmy now has end stage kidney failure from the years of high glucose levels and the long illness with pneumonia, and Jimmy is substantially limited in his ability to eliminate waste. Waste elimination has been recognized as a major life activity by the Fourth Circuit in *Heiko v. Colombo Savings Bank.*, 434 F. 3d 249 (4th Cir. 2006). The Heiko court stated:

> [W]e conclude that waste elimination qualifies as a major life activity. The elimination of bodily waste is basic to any person's daily regimen. It is also a daily activity that the average person can accomplish with little effort, see Rohan, 375 F.3d at 274, by urinating several times a day. The elimination of bodily waste is, moreover, not only "of central importance to daily life," Toyota Motor Mfg., 534 U.S. at 197, but of life-sustaining importance. Without it, hazardous toxins would remain in the body and eventually become fatal. For all of these reasons, waste elimination also fits comfortably within the Equal Employment Opportunity Commission's (EEOC) non-exhaustive list of major life activities, which includes "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i) (2004).
>
> *Id. at 255.*

Thus, there is no requirement that major life activities must be external, visible functions. Other courts have come to similar conclusions. *Fiscus v. Wal-Mart Stores*, 385 F. 3d 378 (3d Cir.

2004); *Kammueller v. Loomis, Fargo & Co*., 383 F.3d 779, 785 (8th Cir. 2004) (holding that plaintiff who underwent dialysis was "incapable of doing activities of central importance to a person's life, such as cleansing one's own blood cells"); *Dillbeck v. Whirlpool Corp.,* 2008 WL 3819824 (S.D. Ind. 2008) (noting that eliminating waste is a major life activity because, without the ability to cleanse toxins from the blood, death would result).

Jimmy's kidney disease, advanced to end stage kidney failure, substantially limits this major life activity. In a normal body the kidneys continually filter and cleanse the blood to rid it of waste, so that it can be eliminated during urination. By about December, 2008, Jimmy's kidney function had precipitously declined to 17%, and his kidneys were no longer properly cleansing his blood. The decline continued, and Jimmy's kidneys became virtually inoperative. Like the Plaintiff in *Heiko,* to avoid toxic build up, and death within a few months, Jimmy is dependant upon dialysis for twelve hours each week to keep him alive.

Jimmy is in almost exactly the same circumstances described in detail by the Court in *Heiko v. Colombo Savings Bank*., 434 F. 3d 249 (4th Cir. 2006). [27] His blood is pumped through a dialysis machine, which purges the toxins and returns the cleansed blood to his body. He is attached to the dialysis machine for twelve hours each week with a needle in a surgically constructed fistula in his arm.

The Fourth Circuit found that the Plaintiff in *Heiko,* based on his end-stage renal disease and dialysis, was substantially limited in a major life activity for purposes of the ADA. "Indeed, no reasonable jury could conclude otherwise." *Heiko, supra, at 252.* The Court gave a spirited explanation why the plaintiff prevailed on the issue.

[27] Unlike the Plaintiff in *Heiko,* Jimmy does not experience side effects from the dialysis. Like Mr. Heiko, Jimmy can arrange his schedule not to interfere with work as an Emergency Dispatcher.

> In order to accomplish the equivalent of urination, Heiko had to insert a needle into his surgically-fashioned fistula and tether himself to a dialysis machine three afternoons per week, for a total of twelve hours. This did not include travel time [and set up] time….Considering Heiko's circumstances through any broader lens on disability only reconfirms a close textual analysis under the statute. We can hardly believe that Congress wished to leave outside the purview of the ADA an individual determined to surmount a real disability and make a constructive contribution to the workplace. The ADA was designed to protect the 'truly disabled, but genuinely capable.' In short, Heiko seems just the sort of person for whom the ADA was intended. Viewed from the perspective of the forest or the trees, the Act's coverage of him is apparent.
>
> *Heiko, supra, at 252.*

Like Mr. Heiko, in order to avoid toxic build up of waste in his bloodstream and death within a few months, Jimmy must be tethered to a dialysis machine for twelve hours each week to keep him alive.

<u>Jimmy Is Protected as an Individual with an Actual Disability</u>

The malfunction of Jimmy's endocrine system progressed, causing ever greater damage, from life-threatening pneumonia, to temporary blindness, to loss of one eye, to complete dependence upon a dialysis machine to accomplish what the rest of the world accomplishes through urination. Although Jimmy was fully able to work from January, 2008, he was substantially limited in his ability to eat, to see, and to eliminate waste as a result of the abnormal blood glucose levels. Each substantial limitation qualified him for ADA coverage, and under EEOC guidance at 29 C.F.R. Part 1630 App. (2005), he was protected by the multiplicity of limitations. Severity and long-term impact are factors to be considered in the determination, 29 C.F.R. § 1630.2(j)(2)(i)-(iii) (2005), along with the effect the limitation has on the individual's life. *Albertson's, Inc, v. Kirkingburg* , 527 U.S. 555, 566 (1999). The life threatening consequences of years of high glucose levels in Jimmy's life are indeed what the Supreme Court had in mind.

PLAINTIFF ALSO COVERED BASED UPON STATEMENTS AND ADMISSIONS BY DEFENDANT

Plaintiff is also protected by the ADA because he was regarded as having a substantially limiting impairment in at least two ways. First, as noted above, Defendant terminated Jimmy based on a law that gives authority to terminate only for those individuals who are substantially limited in a major life activity.[28] By using this legal authority, and affirming it as the basis for its actions, Defendant admitted that plaintiff has a disability. That is undeniable evidence that the county believed that Jimmy had a substantially limiting impairment, and thus regarded him as disabled even if the Court should not find sufficient evidence of an actual disability. To argue that Defendant did not have this belief is to suggest that the county was dishonest in its legal justification, or that it violated its own ordinances by terminating him. This is not a case where Defendant merely held certain beliefs about a plaintiff's ability to perform certain job functions. Here, the ordinance required the county to form an opinion about whether the plaintiff's condition substantially limited his major life activities. The county formed just such an opinion, and regarded Jimmy as disabled.

Jimmy has a claim under the ADA based on his actual disability, diabetes and its consequences, but Defendant having admitted they found Jimmy to have a substantially limiting impairment, he also has a claim based upon Defendant's misperception that he had a different disability - that he was legally blind when he was not.

ELEMENTS OF THE CLAIM: "REGARDED AS" HAVING A DISABILITY

The ADA protects individuals who are regarded as having a substantially limiting impairment from discrimination. 42 U.S.C. § 12102(2)(C) (2000). The elements of the claim are almost identical

[28] Defendant admitted they relied upon Personnel Law, Section 16-189(d), which permits termination where there is a determination that "the employee has a permanent impairment that substantially limits a major life activity." Defendant testified: *Q: "So he was properly terminated under 16-189 D; isn't that right?...Because it applies to his situation; isn't that right? A: Yes."* Flaherty Dep. p. 168 ll. 1-18.

to the elements set out above for discrimination based upon actual disability, as the second and third prongs are the same. Plaintiff must prove (1) that he was regarded as having a disability, (2) that he was qualified with or without accommodation, and (3) that he was excluded from the position on the basis of the disability. *Cline v. Wal-Mart, Inc.,* 144 F.3d 294, 302 (4th Cir. 1998).

As in the claim for discrimination based upon actual disability, the disability imputed to the plaintiff must be an impairment substantially limiting a major life activity. Defendant regarded Jimmy as legally blind. For purposes of the ADA, legal blindness is an impairment substantially limiting a major life activity – seeing. *Kirkingburg v. Albertson's, Inc.,* 143 F.3d 1228 (9th Cir. 1998).

In a recent Fourth Circuit case, *Wilson v. Phoenix Specialty Mfg. Co., Inc.,* 513 F. 3d 378 (4th Cir. 2008), the employer unjustifiably regarded the employee as unable to see and perform manual tasks, and terminated him in violation of the ADA. Phoenix Specialty, like the employer here, terminated the employee based upon a misperception, ignoring all evidence: as that employee Wilson, like Jimmy, had had treatment for his condition, his condition was stabilized, and he had a full release to return to work. *Id. at 385.* Under 42 U.S.C. § 12102(2)(C) (2000), the Fourth Circuit affirmed summary judgment for the employee. *Id. at 388.*

Similarly, in *McKenzie v. Dovala*, 242 F. 3d 967 (10th Cir. 2001) the employer improperly regarded the employee as still disabled, ignoring the fact that the employee had been treated for her disability. As in this case, the employer failed to arrange for testing so that the employee could show the extent of her recovery. The court condemned the employer's misperception, " based on his knowledge of her previous impairment and not on any current inability to perform the job's essential functions." (*emphasis added)* The employer improperly regarded the employee as disabled, contradicting "her own physician's assessment that 'she is ready to return to work.' after treatment." *Id. at 973.*

Defendant's Medical Board designee, Dr. Falik, stated at least twelve times in deposition that the Board regarded Jimmy, who was walking around and driving like a normal person, as disabled - legally blind. [29] Defendant also admitted in their termination letter that Jimmy had a permanent impairment substantially limiting a major life activity. Jimmy has made out the first element of a claim for disability based upon the perception of a covered disability and he is protected under 42 U.S.C. § 12102(2)(C) (2000). The Court may make such a finding as a matter of law under *Hooven-Lewis v. Caldera,* 249 F.3d 259, 268 (4th Cir.2001), and should do so here.

ELEMENTS OF A CLAIM BASED ON RECORD OF A DISABILITY

The ADA also protects individuals who are discriminated against because they have a record of a disability. 42 U.S.C.§12102(2)(B) (2000). Plaintiff must prove (1) that he has "a history of, or has been misclassified as having … an impairment substantially limiting a major life activity, (2) that he was qualified with or without accommodation , and (3) that he was excluded from the position on the basis of the disability. " 29 C.F.R. § 1630.2(k)(2005*).* *Rhoads v. F.D.I.C.*, 257 F.3d 373 (4th Cir. 2001).

The record or history must have been an impairment that substantially limited a major life activity. *EEOC v. R.J. Gallagher Co.,* 181 F.3d 645, 655 (5th Cir. 1999) (plaintiff could be covered by the ADA based on his prior record of impaired vision). This case revolves almost entirely around a one sentence note recording that Jimmy had at one time, for several months, been legally blind. Defendant's 30(b)(6) designee testified repeatedly that they relied entirely on the record, which no longer applied. Falik Dep. p. 29 ll. 9-11, 15-16, 19-20; p. 33 ll. 3-4; p. 45 ll. 11-12. "We had a diagnosis of legal blindness, that's what we chose." Falik Dep. p. 29 ll. 19-21.

---

[29] "...he was legally blind in both eyes." Falik Dep. p. 30 ll. 19-20; "I am faced with…a diagnosis of someone who is legally blind." p. 44 ll.17-19; "he's still being characterized as legally blind. p. 33 ll.19-20; *see also pp. 34, 36, 45, 54, 57.*

The "diagnosis" had been written as an absence excuse, reporting a condition which was not permanent. Defendant relied upon it nonetheless, rejecting Dr. Phillips' January 4, 2008 letter which reported that the diabetic retinopathy had since been treated, and visual acuity restored. Falik did not deny that the evidence contradicted the "record" on which they relied, but the Board had no interest in more current information. [30]

Jimmy was terminated because he had "a history of," and was "misclassified as having … an impairment substantially limiting a major life activity" – blindness, where blindness is a covered disability under the ADA. *Kirkingburg v. Albertson's, Inc., supra*; 29 C.F.R. § 1630.2(k)(2005*).* The first element of a claim under 42 U.S.C. § 12102(2)(B) (2000) is established.

Summary: Jimmy is Protected under the ADA

With an actual disability, Jimmy makes out a claim under 42 U.S.C. § 12102(2)(A). He also makes out a claim under 42 U.S.C. § 12102(2)(C) (2000), based upon Defendant's reliance on a provision in their Personnel Law for employees with a permanent impairment substantially limiting a major life activity, and also based on their repeated statements they regarded Jimmy as legally blind, when he was not Jimmy makes out a claim under 42 U.S.C. § 12102(2)(B) (2000), where Defendant rejected current accurate medical information, and admits they terminated Jimmy based on a record of a previous condition, no longer valid. This Court should rule as a matter of law that Jimmy is entitled to the protections of the ADA. *Hooven-Lewis v. Caldera,* 249 F.3d 259, 268 (4th Cir. 2001).

## II. THE SECOND ELEMENT: A "QUALIFIED" INDIVIDUAL

The second element of a claim for discrimination under the ADA – that the plaintiff is a "qualified" disabled individual - is the same for all three of Plaintiff's claims: discrimination based

[30] Falik Dep. p. 46, ll. 10-15; p. 60, ll. 4-9.

upon actual disability, based upon being regarded as disabled, and based upon having a record of a disability. 42 U.S.C. § 12111(8) (2000). A qualified individual has the "requisite skill, experience, education, and other job-related requirements" for the job. C.F.R. § 1630.2(m) (2005). Jimmy had years of experience performing the Emergency Dispatcher job, Defendant had the highest regard for his performance in the position, and it cannot be denied he was qualified for the job. [31]

Factual Inquiry Required of the Employer

A "qualified" individual must also be able to "perform the essential functions of the employment position that [he] holds or desires" with or without reasonable accommodation. 42 U.S.C. § 12111(8) (2000). The determination whether the disabled individual can do so requires a factual comparison of the individual's abilities with the essential functions of the job at issue. The inquiry must be an individualized inquiry, made case-by-case. *School Board of Nassau Co. v. Arline*, 480 U.S. 273, 287 (1987) ("Such an inquiry is essential if [the statute] is to achieve its goal of protecting handicapped individuals from deprivations based on prejudice, stereotypes, or unfounded fear, while giving appropriate weight to such legitimate concerns of grantees [of risks]."); 29 C.F.R. § 1630.2(0)(3) (employer must "identify the precise limitations" of an employee); 29 C.F.R. Part 1630 App. (2005) (assessment of limitations is case by case); *Champ v. Baltimore County,* 884 F. Supp. 991, 996 (D.Md.1995) (individualized physical exam is necessary); *Childress v. Clement*, 5 F. Supp 2d 384, 391 (E.D.Va., 1998) (under the ADA and 29 C.F.R. Pt. 1630 App. individualized inquiry is required).

---

[31] Director Flaherty testified: Q: "You'd be more than happy to have him return to work with you?" A: "Absolutely…he was a very talented person and an asset to the organization…He's a phenomenal dispatcher." Flaherty Dep. p. 49, l. 1; p. 222, ll. 9-13.

The Fourth Circuit and courts within this circuit have enforced the ADA's requirement for fact-based individualized inquiry. Employers have been liable where they failed to have the employee examined, or where the examination was flawed or perfunctory. Evidence such as a release to return to work from a treating physician, evidence the employee had had treatment, or evidence from the employee's daily life, must be carefully considered, and employers relying instead upon the opinion of a physician who had never examined the employee have been found liable.

Medical Examinations Must Be Fact Based

Where the employer's inquiry whether the employee can do the job includes, or should include, a medical examination, the examination must be fact based, and rely upon fair, accurate, and current evidence. In *Wilson v. Phoenix Speciality Mfg. Co., Inc.,* 513 F. 3d 378 (2008), the Fourth Circuit affirmed a finding of discrimination and summary judgment for the employee, including an award of punitive damages. Employer Phoenix, as in the present case, terminated Wilson without performing any examination, rejecting important evidence about Wilson's day to day life - that he was able to drive, be involved with youth sports, and play golf. *Id. at 382.* Also as in the present case, the employer ignored evidence from Wilson's treating doctor - that Wilson had had treatment for his Parkinson's disease, his condition was stabilized, and he had a release to return to work with no restrictions. As in this case, the employer "instead relied on the opinion of the company doctor who had not [examined him]." *Id. at 382, 385.* Affirming punitive damages, the Fourth Circuit found "reckless indifference to Wilson's federally protected rights under the ADA." [32] *Id. at 384.*

In *Champ v. Baltimore County, et al,* 884 F. Supp. 991, 996 (D.Md. 1995), the U.S. District Court for Maryland cited *Stillwell v. Kansas City Bd. of Police Comm'rs*, 872 F. Supp. 682, 686 (W.D.Mo. 1995). In *Champ,* this Court discussed with approval the *Stillwell* decision to grant plaintiff

[32] In that case the employer had also ignored requests for accommodation.

partial summary judgment where the employer had conducted no physical examination at all. In that case the one-handed applicant, rejected for work as an armed guard, won partial summary judgment because there had been no case-by-case determination as to what he could *actually do*. As in this case, the plaintiff had been turned down "without physical examination or opportunity to demonstrate his physical abilities," and the employer, the Kansas City Police Commissioners, was liable.

Other courts in this Circuit reject flawed or sham examinations of the employee, and require the employer to determine what the individual can *actually do*, based upon valid evidence. In *Taylor v. Hampton Roads Reg. Jail Auth.,* 550 F. Supp. 2d 614, 617 (E.D. Va. 2008), where another one-handed applicant sought to serve as a corrections officer, the employer wrongfully failed to consider the evidence she presented that she could do the job. The employer had relied upon a so-called medical examination which was a sham, "[r]ather than evaluating whether Ms. Taylor was *actually* incapable of working as a jail officer." *Id, at 618* (*emphasis in the original).* The Court clarified that the ADA was intended to move beyond such reliance on " stereotypes about the insurmountability of …handicaps," "and into evidence of a disabled person's *actual* abilities." *Id. at 617 (emphasis added).*

In *Rodriguez v. ConAgra Gro. Prod. Co.,* 436 F.3d 468, 477- 81 (5th Cir. 2006), as in this case, the examination by ConAgra's physician was cursory and incomplete, and the employer terminated Rodriguez based upon "an *imagined* condition." *Id. at 479. (emphasis in the original)* The physician hired by Defendant rejected the evidence from Rodriguez's treating physician, with no individualized inquiry whether Rodriquez was *actually* limited by his impairment. Granting Plaintiff summary judgment, the Court explained that there was no "particularized evidence" that Rodriguez was unable to do the job. Indeed, "there could not have been any without the individualized review required by the ADA." *Rodriguez, supra, at 480-481.*

"ConAgra failed to follow the ADA's mandate that it measure the impact of Rodriguez's

diabetes on his ability to work *in an individualized manner*…. ConAgra had to rely on precisely the type of 'stereotypes and generalizations' … that the ADA abhors. Such reliance is impermissible; it renders [Defendant's] purportedly legitimate justification…discriminatory." *Id. at 480-481 (emphasis in the original).*[33] ConAgra terminated Rodriguez regarding him as unable to do the job although "[i]n fact, all of the particularized evidence….established exactly the opposite." *Id. at 481.* The Court noted that had there been the required individualized review, "we likely would not even be here today." *Id. at 480, n. 42.* Nor would we, in the present case.

Other courts have required adequate examination assessing the *actual* applicant. In *Holiday v. City of Chattanooga*, 206 F.3d 637, 646 (6th Cir. 2000) the employer had no right to rely on a physician's cursory medical opinion, which was "not based on the individualized inquiry mandated by the ADA," and where the record was replete with factual contradictions to his conclusion. *Accord, Gillon v. Fallon Ambulance Serv., Inc.,* 283 F. 3d 11, 27-28 (1st Cir. 2002) (the employer erroneously assumed an applicant was not qualified, without adequate testing).

Defendant Failed to Find Out What Jimmy Could *Actually* Do

As in *Champs, supra,* Defendant denied Jimmy the opportunity to be examined, or to "demonstrate his physical abilities." The County, as the defendant in *Taylor, supra,* relied upon a physician who never evaluated whether Jimmy was *actually* capable of working as an Emergency Dispatcher. The County, like the defendant in *Wilson,* ignored Jimmy's release to return to work, the treatment he had had, and the every day facts of his daily life. Defendant failed to conduct even the most rudimentary inquiry into whether Jimmy could do the job. In this case, as in *Holiday, supra,* the

---

[33] So inviolable is the requirement for an individualized assessment, according to the *Rodriguez* Court, that even if it turned out that Rodriguez's diabetes were uncontrolled, the County would still be liable for the termination because they had acted without particularized evidence, which is evidence of discrimination. *Id. at 480.*

employer relied upon "a cursory medical opinion," "not based on the individualized inquiry mandated by the ADA," where a multitude of facts and evidence contradicted the incomprehensible determination that he was blind. Making no reasonable effort to find out what Jimmy could *actually* do, Defendant terminated Jimmy, based, as in *Rodriguez* upon "an *imagined* condition," and Defendant, like ConAgra, is in violation of the ADA.

III. <u>NOTICE OF DISABILITY AND REQUEST FOR ACCOMMODATION</u>

The ADA defines discrimination to include an employer's failure to respond where an employee or applicant gives notice of a disability and requests accommodation. 42 U.S.C. § 12112(b)(5)(A). Upon such notice, the employer must give consideration to the request, and determine whether accommodation will enable the individual to do the job. 42 U.S.C. 12111(9). According to 29 C.F.R. 1630.2(o)(3), where an employee with a disability requests accommodation, the employer must proceed to "identify the precise limitations" and determine what if any accommodation is appropriate. A flexible interactive process should follow. 29 C.F.R. Pt. 1630 App. (2005).

The elements for a claim for failure to provide reasonable accommodation are the same as those previously set out for a claim of discrimination based upon disability, except that the employer must have been notified of and refused to consider a reasonable request which would have allowed the employee to do the job. *Edmonson v. Potter*, 2004 WL 2980716 (4th Cir. 2004). Jimmy asked for assignment to a job he could do, a sedentary job - Emergency Dispatcher, instead of Communications Specialist, where he had been instructed to report. Defendant made no effort to "identify the precise limitations" Jimmy had, and in fact had no conversations with Jimmy at all, except to tell him he was fired. Any good faith inquiry into Jimmy's abilities would have established that he was not blind.

The Fourth Circuit explains that a request for accommodation triggers the employer's obligation to engage in good faith interactive assessment. *Crawford v. Union Carbide Corp et al.,* 1999 WL 1142346, *17 (4th Cir. 1999) (The employee's initial request for an accommodation… triggers the employer's obligation to participate in the interactive process…"). The Fourth Circuit explained in *Walter v. United Airlines, Inc.,* 2000 WL 1587489, *4 (4th Cir. 2000), "The Federal Regulations envision an interactive process..." in which "the employer must make a reasonable effort."

The requirement for an individualized interactive process, where a disability was disclosed and accommodation requested, has been applied in all circuits. *Calero-Cerezo v. US Dept. of Justice*, 355 F.3d 23 (1st Cir. 2004) (a careful, individualized review of an accommodation request is needed to determine what is needed); *Taylor v. Pathmark Stores, Inc.,* 177 F.3d 180, 192 (3rd Cir. 1999) (the "general logic of the ADA …requires an interactive…individualized evaluation of employees' impairments"); *Taylor v. Principal Fin. Group, Inc.,* 93 F.3d 155, 165 (5th Cir. 1996) (employer's obligation is to participate in interactive process); *Holiday v. City of Chattanooga*, 206 F.3d 637 (6th Cir. 2000) (examination had to be individualized and have objective medical support); *Ammons v. Aramark Uniform Servs Inc.*, 368 F.3d 809, 820 (7th Cir. 2004) (ADA requires a flexible, interactive process to determine); *Cravens v. Blue Cross & Blue Shield,* 214 F.3d 1011, 1021 (8th Cir. 2000) (it was questionable whether employer participated in interactive process despite knowing of plaintiff disability); *Zivkovic v. Southern Cal. Edison Co.,* 302 F.3d 1080, 1089 (9th Cir. 2002) (interactive process requires direct communication between the employer and employee); *Bartee v. Mielin N. Am, Inc.,* 374 F.3d 906, 916 (10th Cir. 2004) (interactive process requires participation by employer after employee provides notice of disability and resulting limitations. Both parties must proceed in reasonably interactive manner).

Individual Assessment is Also Required in "Regarded as" Claims

The rule is activated in a "regarded as" disabled claim, just as it is in a claim based on actual disability. *Henderson v. Ardco, Inc*., 247 F.3d 645, 653 (6th Cir. 2001). "An employer who fails to engage in the interactive process runs a serious risk that it will erroneously overlook an opportunity to accommodate a statutorily disabled employee, and thereby violate the ADA." *Deane v. Pocono Medical Center* 142 F.3d 138, 149 (3rd Cir. 1998).

Many courts have enforced the requirement for an accurate individualized assessment in "regarded as" claims. *Mengine v. Runyon,* 114 F. 3d 415 (3d Cir. 1997); *Lennox v. Wal-mart Stores,. LP,* 2008 WL 763740 (W.D. Pa.); *Johnston v. Mid-Michigan Medical Center-Midland*, 2008 WL 82227 (E.D.Mich. 2008); *Hohider v. United Parcel Service, Inc.,* 243 F.R.D. 147 (W.D.Pa. 2007); *Jacques v. DiMarzio, Inc*., 200 F. Supp. 2d 151 (E.D.N.Y., 2002); *E.E.O.C. v. Exxon Corp*., 124 F. Supp. 2d 987 (N.D.Tex. 2000); *McKenzie, supra, at 971; Wilson, supra, at 385.*

As described below, employers ignore the obligation at their peril.

IV. LIABILITY WHERE EMPLOYERS FAIL TO DO INDIVIDUAL ASSESSMENT

The Fourth Circuit has made clear that the responsibility under the ADA to conduct a good faith interactive assessment cannot be taken lightly. In *Walter v. United Airlines, Inc.,* 2000 WL 1587489, *4 (4th Cir. 2000), the Court cautioned that a disabled employee has a claim under the ADA if the interactive discussion refused by the employer would have resulted in his ability to do the job. In *E.E.O.C. v. Federal Express Corp.,* 513 F.3d 360 (4th Cir. 2008), the Fourth Circuit affirmed that Federal Express's failure to engage in an interactive process with the deaf plaintiff after notice of his disability warranted the substantial punitive damages awarded for the employer's reckless indifference to plaintiff's rights under the ADA. *Id. at 370.*

In *Nichols v. Harford County Bd. of Educ*., 189 F.Supp.2d 325, 337 (D.Md. 2002) this Court clarified, quoting *Barnett v. U.S. Air, Inc.,* 228 F.3d 1105, 1114 (9th Cir. 2000): "relying on the EEOC regulations, in particular 29 C.F.R. § 1630.2 (o)(3) ….and the determinations of other circuit courts, 'the interactive process is mandatory rather than a permissive obligation on the part of employers under the ADA and that this obligation is triggered by an employee or an employee's representative giving notice of the employee's disability and the desire for accommodation.'"

Other courts also warn that an employer's failure to comply will lead to serious repercussions. The Court in *Taylor v. Pathmark Stores, Inc.,* 177 F.3d 180, 193 (3rd Cir. 1999) cautioned that an employer who acts on the belief that a perceived disability inherently precludes performance of the essential functions of a job "is failing to make an individualized determination, as the ADA requires, and thus acts at its peril." As the Court in *Barnett v. U.S. Air, Inc.,* 228 F.3d 1105, 1115 (9th Cir. 2000) explained: "Most circuits have held that liability ensues for failure to engage in the interactive process when a reasonable accommodation would otherwise have been possible." *Accord, Williams v. Phila. Housing Auth. Police Dep't*, 380 F3d 751, 772 (3rd Cir. 2004) (where employers have failed to engage in the interactive process in good faith, if the Court can reasonably conclude that the employee would have been able to perform the job, the employer will be liable).

Defendant's Failure to Respond to Notice and Request for Accommodation

Jimmy was very pleased, in early December, when Defendant instructed him to report back to work. As he explained to Director Flaherty, however, at their meeting on December 10, 2007, he had a disability and could not perform the Communications Specialist job to which Defendant was assigning him. He asked for an accommodation - assignment to a sedentary job, a job he *could* do, one which he had been performing in the past, and one for which the County had a need. Defendant had an unavoidable obligation to make a reasonable good faith effort to find out what Jimmy's limitations, if

any, actually were.  Instead they responded with a fake review, and termination.  Had Defendant

proceeded according to  29 C.F.R. 1630.2(o)(3) (2005), to " identify the precise limitations" of the

employee,  through interactive discussion the employer would have learned the actual state of Jimmy's

vision, that he was not blind, and that he could perform the job he had requested.

V.  THE SECOND ELEMENT:  PLAINTIFF WAS QUALIFIED AND COULD DO THE JOB

In this case, where testimony established that the Defendant relied entirely upon the Medical

Board, and that the Medical Board relied entirely upon the assumption that Jimmy was legally blind,

the sole issue is Jimmy's vision, and whether the Board's finding  -  that Jimmy was blind – was a

reasonable fact-based assessment in compliance with the ADA.

Jimmy submitted to the County exactly what they had asked for:  letters from the two

physicians who were treating him, stating that he could do the job.  Both Dr. Phillips and Dr. Rao

looked at the Emergency Dispatcher job description and discussed the job with Jimmy before they

released him back to work without restriction.  It was clear that the Emergency Dispatcher duties

consisted of reading and entering emergency information on a computer screen.  Dr. Rao stated in her

Affidavit that Jimmy had discussed the job functions of the Emergency  Dispatcher with her, before

she deliberated and then made the assessment that he could perform that job, and not the

Communications Specialist position.  It had been specifically explained to Dr. Phillips, in the County's

letter to him, that the visual requirements,  per the National Fire Protection Association standards,

were the ability to "Distinguish, differentiate, and respond to multiple visual stimuli such as printed

documents, CRT display, and indicator lights."  The board-certified ophthalmologist, who had

examined and treated Jimmy in twenty-five office visits in the recent past, stated in his January 4, 2008

letter to the County, and again in deposition that Jimmy should be able to do the "duties described."

The notion that not one, but two reputable physicians would release someone who was blind to perform and supervise transmission of public safety emergency messages on a computer all day is absurd.

Defendant's Unreasonable Reliance on an Outdated Sick Note

Defendant states that they chose to rely upon a single sentence written eight months prior, on "a little slip" from a pad of "sick certificates," like the many that Jimmy submitted each month to explain to his employer why he was not at work. It had been written when Jimmy had recently regained consciousness after months in a coma; four months before the successful retinopathy surgery which Defendant's board of physicians knew Jimmy had received; and eight months before both of Jimmy's doctors released him to return to work. The Medical Board ignored the evidence they had specifically requested from Dr. Phillips: that a successful vitrectomy surgery had been performed, that Jimmy's visual acuity had been restored, and that Jimmy's vision was stable; and that he was fully able to perform the job duties.

The Sick Note had been Rescinded

According to the Board's reasoning, nothing from Jimmy's board-certified physicians, no matter how current and how explicit, was of any significance: Jimmy was blind because Dr. Phillips hadn't written out a "rescission" of the outdated sick note. In deposition Dr. Phillips explained the June, 2007 sick note he had written: it had specifically reported blindness from diabetic retinopathy - which is blood in the eye, with a loss of visual acuity. When a vitrectomy, removal of the blood from the eye, is performed, and visual acuity restored, both of which were reported in Dr. Phillips' January 4, 2008 letter, it is not possible for the patient to still be legally blind, as the doctor explained. Dr. Phillips testified that his letter had in fact "rescinded" the diagnosis of legally blind, which could no longer be valid.

Dr. Phillips also testified, as had Defendant's Administrator Kathleen Colbert, that physicians who are asked to comment on their patients' ability to go back to work generally respond with the current information on the patient's abilities, and they do not go back to "rescind" prior reports which had been submitted to explain why the patient was absent in the first place. (*see p. 15 herein*)

Defendant's Flawed Reasoning

The Board's reasoning, presented pursuant to Plaintiff's Rule 30(b)(6) Deposition Notice, makes no sense. Dr. Falik testified that the visual tasks - distinguish, differentiate, and respond to multiple visual stimuli such as printed documents, CRT display, and indicator lights -  are the essential functions of the Emergency Dispatcher job, and he agreed that Dr. Phillips had found that Jimmy could perform them. He testified that he accepted Dr. Phillips' judgment, and that "we don't question…" judgments from a specialist. But Jimmy was still considered legally blind.

Falik had no explanation how Jimmy could meet the enumerated national standards, and according to both his doctors, be competent to read and transmit data on computer screens, and still be blind. Asked by Counsel, "Are you trying to tell me that you can be legally blind and still able to do all those things that I described?" Falik answered consistently that there had once been a diagnosis of legal blindness that hadn't been rescinded. Falik was asked whether the diagnosis of blindness "conflicted with Dr. Phillips' opinion that he – Mr. Hook could do the job, isn't there a conflict there?" He was asked how Jimmy could have been, since September, "able to do every visual function in normal life" if he were blind? He consistently responded, "I'm not an ophthalmologist. I can't answer that. "

Dr. Falik did not deny the ridiculous contradictions. Arguing he couldn't answer because he wasn't an ophthalmologist, Falik nonetheless didn't want any further clarification from an ophthalmologist. Dr. Phillips had ended his letter with, "If you have any further questions or concerns,

please do not hesitate to contact me. ” But the Board didn't want clarification from the ophthalmologist. ("I didn't want anything." Falik Dep. p. 53, ll. 6-12)

Defendant's explanation is not worthy of credence. Defendant's alleged belief that Jimmy was blind never appeared in their November 26, 2007 letter of inquiry to the ophthalmologist Dr. Phillips; never appeared in the January, 2008 report where they cleared Jimmy to return to the Emergency Dispatcher position; never appeared in the abrupt and unexplained reversal a month later which was based on absolutely no new information. The determination that Jimmy was legally blind appeared for the first time, in fact, during deposition on March 16, 2010, when Defendant was required to explain in what way Jimmy was unfit.

Decision maker Herron, Director Flaherty, and Pension Administrator Colbert all testified dispositively that there was no individualized inquiry, required by the ADA, into what Jimmy could or could not do. No one met with him to see if he were blind, or had him examined, or sought further information about the status of his vision or what he could *actually* do, nor had anyone else been instructed to make such an inquiry. If they had, as the court in *Rodriguez* noted, "we would not be here today."

Any Reasonable Inquiry Would Have Shown Jimmy was Qualified

Had Defendant inquired they would have learned that Jimmy's vision was actually better now than the vision he had had during years on the job. Although in deposition Dr. Phillips repeated that with the 20/80 vision in his right eye Jimmy was fully capable of performing the job duties, Dr. Phillips also explained that after his illness and surgery, Jimmy's vision in the right eye, the eye he had almost always used, had actually improved over what it was in the past when he had been a star performer, to 20/60. Dr. Phillips testified: "[B]ased on seeing patients daily and what patients are able

to do…there aren't really many limitations that you have at that level of visual acuity." Phillips Dep. p. 39, ll. 2-6.

A rudimentary inquiry would have revealed Jimmy simply put his glasses back on, days after his surgery, and began driving his son to and from school each day, and himself to the gym. Beginning in fall of 2007, he returned to the Hyattsville Volunteer Fire Department, where he was and is Deputy Fire Chief, and he spent his days reading and writing administrative fire procedures and updating them, all tasks requiring normal eyesight. Numerous witnesses testified they saw Jimmy performing the usual visual activity which people perform in their everyday life: walking, cooking, reading, watching TV, playing video games. By summer, 2008, six months later, he was able to resume driving a fire truck, performing rescues of people trapped in flaming apartment houses, and wrenching victims of terrible accidents from the tangled remains of their automobiles, as he still does.

Defendant violated the ADA, where Jimmy was qualified and able to perform the job functions of an Emergency Dispatcher, and Defendant failed to make a reasonable determination whether he could do so with or without accommodation, and terminated him instead.

**CONCLUSION**

Jimmy is covered by the ADA as an individual with a permanent impairment, diabetes, which substantially limits his ability to eat, to see, and to eliminate waste. Defendant's termination letter also admits that they regarded him as having such an impairment, and Defendant's Medical Advisory Board testified repeatedly that they regarded Jimmy as being legally blind, an ADA covered impairment. The same Board testified they relied entirely upon a record of Jimmy's previous condition, the legal blindness he had had eight months prior. Jimmy has established the first element of a claim under the ADA.

As to the second element – whether Jimmy was qualified, Defendant readily admits that Jimmy had been an excellent performer in the Emergency Dispatcher job.  Jimmy presented convincing evidence that he could do the job from his board-certified treating physicians, who were fully familiar with his condition and the job tasks.  The defense that the Medical Board was justified in rejecting the evidence of Jimmy's physicians, to take the position instead that he was blind based on an outdated sick note is not credible.  The County acted upon fears, and myths, unsubstantiated and improbable assumptions, refusing to undertake any inquiry into what Jimmy could actually do.  Defendant refused to engage in an interactive process to assess the employee's "precise limitations" after  Jimmy had disclosed his disability and asked for accommodation. Defendant is in violation of the ADA.

As to the third element, Defendant admits Jimmy was terminated on account of his purported disability.  This Court should find Defendant liable for discrimination on the basis of disability as a matter of law, order reinstatement, backpay, and attorney fees, with hearing upon the issue of compensatory damages.