UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND
Southern Division

| | |
|---|---|
| _____ : | |
| JAMES HOOK | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : Civil Action No. 09-cv-1630 RWT |
| PRINCE GEORGE'S COUNTY, MARYLAND | : |
| OFFICE OF HOMELAND SECURITY | : |
| | : |
| Defendant | : |
| _____ : | |

PLAINTIFF'S RESPONSE TO DEFENDANT'S CROSS MOTION
FOR SUMMARY JUDGMENT AND
REPLY TO DEFENDANT'S RESPONSE TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Respectfully submitted,

_____/s/_____
Nancy Brewer, Bar #17088
The Zipin Law Firm, LLC
8403 Colesville Rd., Suite 610
Silver Spring, MD 20910
Ph: 513-979-4138 (preferred)
      301- 587-9373
nbrewerwv@msn.com
Counsel for Plaintiff

Served electronically to:
sljohnson@co.md.pg.us

# TABLE OF CONTENTS

I.    PlAINTIFF IS COVERED BY THE ADA                                        1

      DEFENDANT REGARDED JIMMY AS DISABLED                                   1

      DEFENDANT FIRED JIMMY BASED UPON A RECORD OF IMPAIRMENT                2

      JIMMY'S ACTUAL DISABILITY – KIDNEY DISEASE, AND  DIABETES              4

II.   DEFENDANT DOES NOT REBUT PROOFS THAT JIMMY WAS QUALIFIED              6

      "Legal Blindness from Diabetic Retinopathy" is Blood in the Eye        6

      Jimmy had had Treatment, and could not have still been Legally Blind    7

      Dr. Phillips' Letter Reported that Jimmy was no longer Legally Blind    7

      Dr. Phillips' Certainty that Jimmy's Vision was Sufficient for the Job  8

      The Non-Existent "Large Black Spot"                                     9

III.  DEFENDANT'S PURPORTED UNDISPUTED MATERIAL FACTS ARE                   10
      MISLEADING OR DEMONSTRABLY FALSE

      ALLEGATION THAT JIMMY NEEDED LIGHT DUTY IS A FABRICATION              11

      THE NEW APPLICANT'S TEST IS IRRELEVANT TO THIS CASE                   14

      Caselaw Establishes the Relevant Time Frame                           16

IV.   PLAINTIFF'S EVIDENCE IS UNCONTRADICTED                               17

V.    DEFENDANT'S DIRECT THREAT DEFENSE FAILS                              19

VI.   FINAL ELEMENT: TERMINATION UPON DISABILITY                           24

`

## EXHIBITS

Ex. 1        "Sick Certificate" written by Dr. Phillips, June 5, 2007

Ex. 2        January 4, 2008 Letter from Dr. William Phillips to Defendant, and Affidavit

Ex. 3A       January 10, 2008 Medical Release by Dr. Rao

Ex. 3B       Report and Affidavit by Dr. Rao

Ex. 4        Report and Affidavits by Dr. Kronfli

Ex. 5        January 10, 2008 Report by Medical Advisory Board

Ex. 6        Report of Dr. Anshu Sinha, The Glaucoma Center

Ex. 7        Letter of inquiry from the County to Dr. Phillips, November 26, 2007

Ex. 8        November 6, 2007 Letter from Dr. Phillips to Defendant

Ex. 9        November 7, 2007 Release by Dr. Rao

Ex. 10       Prince George's County Memorandum to P.G. Co. Human Relations Commission

Ex. 11       Email from Charlynn Flaherty to William McBride

Ex. 12       Plaintiff's Responses to Interrogatories from Defendant

Ex. 13       Criticall website posting

Ex. 14       Dr. Phillips' Curriculum Vita

## AFFIDAVITS

Affidavit of Korri Kaplan

Affidavit of Stephanie Miller

Affidavit of Lieutenant Steve Brown

Affidavit of James Hook

## DEPOSITION EXCERPTS

Dr. William Phillips Deposition

Dr. Joel Falik Deposition

Charlynn Flaherty Deposition

Vernon Herron Deposition

James Hook Deposition

I.      PLAINTIFF IS COVERED BY THE ADA

DEFENDANT REGARDED JIMMY AS DISABLED

Jimmy has established the first element of his claim under 42 U.S.C. § 12102(A)(B) and (C), the American's with Disabilities Act ("ADA").  In their discussion, Defendant raises no material facts in dispute to deny that the Defendant regarded Jimmy as having a permanent impairment substantially limiting a major life activity – legal blindness. (*"Def's Brf." pp. 16-18*)[1]  42 U.S.C § 12102(C) protects individuals who are mistakenly regarded as having a substantially limiting impairment, where either the individual doesn't have any such impairment, or where it is non-limiting contrary to the employer's assumptions. 29 C.F.R. § 1630.2(l).  Plaintiff's claim is based upon the County's misperception that Jimmy was blind, an impairment substantially limiting a major life function under the ADA, *Kirkingburg v. Albertson's, Inc.,* 143 F.3d 1228 (9th Cir. 1998), although as Defendant does not deny, Jimmy was in fact living his life as a normal sighted person.  *See Plaintiff's Memorandum in Support of Summary Judgment* [Dkt. No. 36] *( "Pl's Memo," p. 3-4.)*

Defendant's Medical Advisory Board designee, Dr. Falik, stated at least twelve times in deposition that the Board regarded Jimmy as legally blind,[2] and that that was the reason, and the only reason they recommended he be terminated.  The County wholly adopted the position of the Medical Board, as final decision-maker Vernon Herron and Public Safety Communications Director Charlynn Flaherty admitted repeatedly in deposition,[3] which Defendant does not deny.   Defendant stated in their

---

[1] Defendant's assumption that the "regarded as" claim is based upon diabetes is a misunderstanding of Plaintiff's claim.  *Memorandum in Support of Prince George's County, Maryland's Cross Motion for Summary Judgment* [Dkt No. 41] ("*Def's Brf")*

[2] Falik Dep.  p. 29, ll. 14-16; p. 30, ll. 18-20; p. 33, ll. 2-4, 19-20; p. 34, ll. 9-11; p. 36, ll. 4-6; p. 44, ll, 17-19; p. 45, ll. 11-12; p. 54, ll. 6-7; 57, ll. 9-10.  *See Pl's Memo. page 12.*

[3] Herron relied "solely" upon the Medical Board, had no other information or evidence, and no independent opinion. Director Flaherty stated the same. Herron Dep. p. 15, ll.5-8, 13-14; p. 13, ll. 4-16; Flaherty Dep. p. 49, ll. 8-19; p. 134-5, ll. 10-1; p. 135-6, ll. *See  Pl's Memo, p. 10.*

letter terminating Jimmy that they acted under Personnel Law, Section 16-189(d), which only applies upon a determination that "the employee has a permanent impairment that substantially limits a major life activity." Director Flaherty testified that the provision was properly applied in Jimmy's case. Flaherty Dep. p. 167, ll. 13-17; p. 168, ll. 1-18.   *See discussion, Pl's Memo. p 17 and Exhibits 15, 16.* The ordinance required the county to form an opinion about whether Jimmy had such a substantially limiting impairment.  They determined that he did, and went forward with the termination on that basis, as they admit.

Defendant has not rebutted Plaintiff's proofs that Plaintiff is covered by 42 U.S.C. §12101(C). Defendant's description of Director Flaherty's discussions with Jimmy about coming back to work, and the argument that Defendant did not take action against Jimmy on account of his diabetes during the years preceding his illness, prove nothing. *Def's Brf. p. 18.*  Defendant <u>did</u> take discriminatory action, termination, based upon the unexamined presumption that Jimmy was blind when he was not. Defendant's statement ("Logic dictates that, if Defendant regarded him as disabled, positions would not have been offered to Plaintiff") is a fallacy.  Jimmy was never offered any position: he was fired.

<u>DEFENDANT FIRED JIMMY BASED UPON A RECORD OF IMPAIRMENT</u>

Defendant does not deny Plaintiff's proofs that he is protected under the ADA, 42 U.S.C.§12102(2)(B), where he has "a history of, or has been misclassified as having … an impairment substantially limiting a major life activity" and it is conceded.  29 C.F.R. §1630.2(k). *Pl's Memo, p. 32-33.*  Defendant's sole reason for terminating Jimmy was the one sentence note recording that Jimmy had at one time, for several months, been legally blind.  Ex. 1, herein.  Defendant's 30(b)(6) designee testified repeatedly that they relied on that record, which no longer applied. "We had a diagnosis of legal blindness, that's what we chose – that's on what we based our decisions…." Falik Dep. p. 29, l.19 – 30, l.1;  Falik Dep. p. 33, ll. 5-20; p. 44, ll. 17-19; p. 30, ll. 19-20.

The note, one of the many monthly notes Jimmy had to submit, was written at the time when Jimmy had only just regained consciousness after months in a coma, four months before the vitrectomy which restored his sight, and eight months before both of Jimmy's treating physicians, primary care physician Dr. Jyothi Rao, and ophthalmologist Dr. William Phillips submitted releases authorizing him to return to his Emergency Dispatcher job.  Ex. 2: January 4, 2008 Letter, Aff. from Dr. Phillips; Ex. 3: January 10, 2008 Release, Aff. from Dr. Rao, herein.  The note was "…what we'll give to a patient…to take back to usually their employer or school..." Phillips Dep. p. 18, ll. 10-13; "…it's just a little slip, yeah…a sick note." Defendant's Administrator Kathleen Colbert Dep.  p. 19, l.13.

As Plaintiff explained, *Pl's Memo. p. 13-15,* the note, describing a condition which was not permanent, [4] had been superseded  by Dr. Phillips' January 4, 2008 letter which stated that Jimmy's sight had been restored.  Ex. 2, herein.  Both Dr. Phillips and Defendant's Administrator Colbert testified that physicians, asked about the patient's present condition, are not obliged to go back to revisit and formally "rescind" sick notes they previously provided. Phillips Dep. pp. 46-47, ll. 17 – 15;  Colbert Dep. p. 20, ll. 7-12; p. 21, ll. 8-13.  *See Pl's Memo, p. 4.*

Defendant terminated Jimmy based, 1) upon their unjustified and discriminatory assumption that he was blind, and, 2) upon the outdated record showing he had once had the impairment.  Blindness is a covered disability under the ADA, *Kirkingburg v. Albertson's, Inc.*, 143 F.3d 1228 (9th Cir. 1998),  and the evidence overwhelmingly shows that Jimmy was driving, reading and writing, cooking, and playing with his son as a normal person.  *Pl's Memo. p. 3-4, with Affidavits of Joe Bickley, David Cooksey, Carolyn Kettenhofen, Chief T. David Hang, Toni Cooksey.*  The Court should rule as a matter of law that Plaintiff  has established the first element of his claim under both 42 U.S.C. §12102 (B) and (C).

---

[4] "Well, yeah, it no longer comes into play, because it wasn't a permanent condition…So, yeah, it's updating his status and certainly as of the January 4 letter at 20/80, he's not legally blind." Phillips Dep. p. 46, ll. 6-16.

JIMMY'S ACTUAL DISABILITY –  KIDNEY DISEASE AND DIABETES

Years of diabetes took their toll on Jimmy and his nephologist, Dr. Kronfli, attests herein that by January, 2008, Jimmy had end stage renal failure, which requires twelve hours of dialysis each week. Dr. Saeed Kronfli, board certified nephrologist who has been treating kidney disease for almost twenty years, and who treats Jimmy for the impairment, describes the condition, how it evolved from the high blood sugar from diabetes, and the effect it has on  Jimmy's life and body.  Ex. 4, Report and Affidavits of Dr. Kronfli, herein.

As Dr. Kronfli describes, by winter, 2008, Jimmy's kidneys were virtually inoperative.  They were, and are unable, to perform the essential life function – removing body waste, created whenever the body processes protein, from the blood.  In a normal person tiny filtering structures within the kidneys perform a continuous filtering function, moving the toxic waste products, created in digestion, from the blood into urine, where in a normal person it is eliminated through the simple process of urination.  The high blood sugar level that Mr. Hook has, as a diabetic, required the kidneys to filter too much blood. The small delicate blood vessels that nourish the filtering structures in the kidneys were damaged from overwork, and Jimmy's kidneys lost their filtering ability.  In a normal person, the kidneys continually filter and cleanse the blood, removing waste to urine for removal.  Since Jimmy's kidneys can't perform this vital function, the waste products, hazardous toxins, would just build up in his blood.  Failure to remove the waste would be fatal, so Jimmy is attached to a dialysis machine by a needle placed in his arm through a surgically constructed "fistula" three times a week, for twelve total hours of dialysis. Jimmy is able to work, but there is no cure for his end stage renal disease. Ex. 4: Report and Affidavits by Dr. Saeed Kronfli, herein.

The Fourth Circuit found in *Heiko v. Colombo Savings Bank,* 434 F. 3d 249 (4th Cir. 2006) that elimination of body waste in the blood was "not only of central importance to daily life, but of life-

sustaining importance." *Id. at 255.* The body's inability to perform the function due to end stage renal disease was a limitation of a major life function, and "was a substantial one because Heiko was required to spend at least four hours, three days a week undergoing dialysis." "Indeed, no reasonable jury could conclude otherwise." *Id. at 257-258.* Jimmy is in almost exactly the same circumstances described in detail in that case. Jimmy is just like Mr. Heiko, who as the Court described, was tethered to a dialysis machine for twelve hours a week, where his blood was pumped through a dialysis machine to purge the toxins and return the cleansed blood to his body. As the Court stated, this dramatically distinguished him from the general population. *Id. at 257.* Just as the Court described Mr. Heiko, Jimmy remains determined and able to work at his job despite the daily impediments he faces. *Id. at 257.* The Fourth Circuit could well have been speaking of Jimmy where they state:

> We can hardly believe that Congress wished to leave outside the purview of the ADA an individual determined to surmount a real disability and make a constructive contribution to the workplace. The ADA was designed to protect the "truly disabled, but genuinely capable"….In short, Heiko seems just the sort of person for whom the ADA was intended. Viewed from the perspective of the forest or the trees, the Act's coverage of him is apparent.
>
> *Heiko, supra, at 258.*

The Fourth Circuit's spirited conclusion that Heiko must be covered as an individual with an actual disability impels this Court to find that Jimmy's end stage renal failure is a permanent impairment substantially limiting his ability to eliminate waste, and that he is covered under 42 U.S.C. §12101 (A) as a matter of law. [5]

---

[5] Regarding Jimmy's ability to eat, contrary to Defendant's allegation, Jimmy's physician, Dr. Rao, unlike the physician in *Vailes v. P.G. Co.,* 2002 WL 142117 (4th Cir. 2002), described in detail how Jimmy had to prick his finger and draw blood six times a day before eating to test his glucose level, and how he had to manipulate his six small meals through the day to control his glucose level according to what the test revealed. Ex. 3B, herein. That is not the way an average person eats. *Def's Brf. p. 12-14.* Contrary to Defendant's assertion, Jimmy continued to need to inject himself with insulin three times a day throughout the relevant period and beyond, although he does not do so now. *Aff. J. Hook.* Dr. Phillips also testified about the ongoing harm from diabetic retinopathy. Phillips Dep. p. 17. *Pl's Brf. p. 21, 16-17.*

## II.     DEFENDANT DOES NOT REBUT PROOFS THAT JIMMY WAS QUALIFIED

Defendant admits they performed no factual, individualized comparison of the essential

functions of the job with Jimmy's abilities, as required.  *School Board of Nassau Co. v.  Arline*,  480

U.S. 273, 287 (1987); 29 C.F.R. Pt. 1630 App.; *See Pl's Memo, pp. 34-38.*  When asked, "Then – you

never compared the essential functions of the job with what Mr. Hook could then do, an individual

basis?" Dr. Falik answered, "No…we don't do that." Falik Dep. p. 47, l.19- 48, l.12.  Decision maker

Vernon Herron was asked "Before you decided to terminate Mr. Hook, you didn't do any individual

assessment to see if Mr. Hook could do the emergency dispatcher job with or without accommodation?"

He answered, "I did not.  Herron Dep. p. 27, ll. 9-13.  Director Flaherty could identify no

individualized assessment that had been done of Jimmy's purported limitations and his ability to do the

job.  Flaherty Dep. pp. 126, 133, 136, 148, 150-151.  Defendant conducted no fact-based inquiry, and

never had any reasonably current evidence to support the  termination.  Defendant raises no genuine

issue of material fact as to Plaintiff's proofs that he could do the job.

### "Legal Blindness from Diabetic Retinopathy" is Blood in the Eye

Defendant alleges incorrectly that "Plaintiff did not provide any medical documentation that he

was no longer legally blind." *Def's Brf. pp. 8-9, 20.*  The outdated June 5, 2007 sick note upon which

Defendant relies did not say simply state that Jimmy was "legally blind." It stated: "Patient is legally

blind from diabetic retinopathy." Ex. 1.  Dr. Phillips explained in testimony what the medical doctors

comprising Defendant's  Medical Board should have known, or found out, which is that obstructed

vision from diabetic retinopathy has a single specific meaning – that there is "blood floating around

inside the eye" -  blood which was surgically cleared, as reported in Dr. Phillips' letter.  (Q: "You had

written in June…you said he was legally blind from diabetic retinopathy… and that means blood in the

eye?"  A: "Right."  Phillips Dep. p. 44, ll. 16-21.  "The reason the vision was down was from the blood

in the eye….the diabetic retinopathy. That resulted in bleeding, which hadn't cleared, and that's why he couldn't see at that time." Phillips  Dep.  p. 19, ll. 6-11.)  *All citations to Dr. Phillips' Deposition are attached.*

Jimmy had had Treatment, and could not have still been Legally Blind

As the physicians on the Medical Board should have known, or should have found out, blood in the eye from diabetic retinopathy is treatable through surgery to clear it, a vitrectomy, which as Dr. Phillips reported, had been performed.  Phillips Dep. pp. 13-16.  ("And he did end up having the surgery…a vitrectomy…. So we were able to get the bleeding to stop and the vision to improve…" Phillips Dep. p. 14; p. 16, ll. 3-4.  "We were able to treat the bleeding and the swelling.  We got his vision improved to 20/60…there aren't really many limitations that you have at that level of visual acuity." Phillips Dep. p. 38-39, ll. 16-6).

Dr. Phillips' Letter Reported that Jimmy was no longer Legally Blind

Dr. Phillips explains that the only visual problem that can be justifiably assumed to exist from diabetic retinopathy is the obstructed visual acuity, and Jimmy's visual acuity had been restored.  (Q: "And as far as any other kind of visual problem that could possibly be there, no other visual problems were implicated in your original note that he was legally blind, were they?" A: "No."  Q:  "When you clear the eye and restore the visual acuity, the person is no longer blind; isn't that right?"  A: "Correct." Phillips Dep. p. 39, ll. 12-17; Phillips Dep. p. 44, l.14 - p. 45, l. 8). The old June 5, 2007 sick note saying that Jimmy was legally blind had been "rescinded….was no longer valid?"  "Well yeah, it no longer comes into play, because it wasn't a permanent condition." Phillips Dep. p. 45, l.9 - 46, l.10.  As Plaintiff argued above, physicians do not send formal "rescission" of old sick notes.

<u>Dr. Phillips' Certainty that Jimmy's Vision was Sufficient for the Job</u>

Dr. Phillips was confident Jimmy could do the job.  He testified that after Jimmy described the Emergency Dispatcher job to him, he determined, "Based on the vision of 20/80, I felt that he should be able to do that." Phillips Dep. p. 29, ll. 4-11.  "The vision had improved to the point where he should be able to see to work." Phillips Dep. p. 37, ll. 17-19.  Asked about his level of certainty, Dr. Phillips expressed no doubts: "We got his vision improved to 20/60, which for pretty much any job you wouldn't be able to not let someone work…. Based on seeing patients daily and what patients are able to do with a vision of 20/60, there aren't really many limitations that you have at that level of visual acuity…There aren't many things you wouldn't be able to do with vision of 20/60." Phillips Dep. p. 38, l.4 - 39, l.11.

 Asked to testify "to a reasonable degree of medical certainty," Dr Phillips explained that his expertise is ophthalmology and the treatment and evaluation of retina issues; as such he is not responsible to comment on every possible unrelated eventuality.  *Young v. U.S.,* 181 F.R.D. 344 (W.D. Tex, 1997) (a treating physician's opinions are based upon examination and care of his patient informed by his unique expertise as a physician, not as a F.R.C.P. Rule 26 witness).  Questioned about his "degree of medical certainty,"  Dr. Phillips testified that within the realm of the medical issues he deals with, and for which he treated Jimmy ("the visual issues you deal with and did deal with"),  there wasn't much Jimmy couldn't do, or many jobs he wouldn't be able to perform.  Phillips Dep. p. 38, l.4-40, l.1.

Dr. Phillips also testified that although he had stated Jimmy's 20/80 acuity was sufficient, in actuality Jimmy's right eye vision had improved and was even better in February, 2008, at 20/60, than it had been before.  Jimmy could certainly do with his improved vision everything he had previously been able to do in the past, before his surgery, when he was so successful as an Emergency Dispatcher. Phillips Dep. p. 42-43, ll. 18-6.  ("I will reiterate, he was a phenomenal employee." Director Flaherty Dep. p. 49, ll.1-7 herein).  Dr. Phillips also explained that visual acuity, the only visual problem Jimmy

ever had, and the one which had now been treated, was the measure of whether one can work effectively on a computer.  He testified:

Q:      Whatever he could do before this diabetic retinopathy bout…summer of '07…there's no reason to think he couldn't do exactly the same thing by November, December, '07, isn't that right?

A:      Correct.                                              Phillips Dep. p.  41, ll. 4-11

***

Q:      So… from October 19, there is absolutely nothing to say that he could not read perfectly well consistently… from about November '07 there's no reason to think he could not read perfectly well at all times; isn't that right?

A:      Based on the visual acuity, correct.      Phillips Dep. p. 42, ll. 2-13

****

Q:      Now, reading on a computer screen is mostly a matter of visual acuity; isn't that right?

A:      Correct.                                              Phillips Dep. p. 43, ll. 7-10

The Non-Existent "Large Blind Spot"

Defendant's Rule 30(b)(6) designee, Dr. Falik, who had repeatedly admitted his limited knowledge of ophthalmology, hypothesized:  "your central retinal vision may be significantly affected by large blind spots."  *Def's Brf. p. 8.*  Dr. Falik had conjectured in deposition that Jimmy might have a "block in the visual field,"  Falik  Dep. p. 28, ll. 18-21, also stating they had received no "visual field test." Falik Dep. p. 26, l.9.  But when the Board deliberated, according to their  January 10, 2008 Report, Exhibit 5, herein, they had the letter from Dr. Anshu Sinha at the Glaucoma Center, Jimmy's glaucoma specialist, which discusses the visual field tests she conducted, reporting no "large blind spots."  Ex. 6: Letter by Dr. Sinha, The Glaucoma Center, herein.

Dr. Phillips had already explained that Jimmy's diabetic retinopathy affected his visual acuity only, and no other visual issues or limitations could justifiably be implied from the June 5, 2007 sick note.  But further information about Jimmy's vision was contained in Dr. Sinha's letter, which  included "…a report of a 24/2, which is the central visual field test" which she had conducted.  Phillips Dep. p.

9

33-34, ll. 18-3.  Dr. Phillips confirmed that  "Nothing in [Dr. Sinha's] report indicates anything – any problems with his right eye that would prevent him from being able to read perfectly well."  "The reading to the 20/60 level is what she was able to get and we ended up getting the same acuity."  As to any possible limitations in Jimmy's visual field, he confirmed, "there's nothing in this report that indicates in any way that he has limitations with his right eye….Everything – the pressure was normal."  Dr. Sinha reported no abnormalities with the right eye.  Phillips Dep. p. 43, ll. 11 - 44, ll. 6.

Although Dr. Sinha's report established that Jimmy had no "blind spots," Dr. Falik seemed not to have understood that his concern, Jimmy's visual field, had been addressed in records that he had reviewed.  Asked in deposition, "Did this report from the glaucoma center have any particular relevance to your final decision?" Dr. Falik answered, "I don't believe so." Falik Dep. p. 19, ll. 6-16.

In their Brief, Defendant advances further arguments to impugn Jimmy's ability to do the job, based upon facts purportedly undisputed, but which are demonstrably false, or irrelevant to this case.

III.   DEFENDANT'S PURPORTED UNDISPUTED MATERIAL FACTS IMPUGNING JIMMY'S ABILITY ARE MISLEADING OR DEMONSTRABLY FALSE

"Undisputed materials facts" relating to Jimmy's ability to do the job in Defendant's Brief are demonstrably false.  Defendant incorrectly states, *Def's Brf, p. 8,*  that the Medical Board found Jimmy unfit at the January 10, 2008 meeting. Ex. 5,  January 10, 2008 Report by the Medical Board, states, "Mr. Hook should be given an opportunity to perform the job of Emergency Dispatcher."  Dr. Falik has testified that at that time the Board was fully aware that the job involved processing life and death emergency calls, but the Board evidently had no concerns about public safety.  Falik Dep. p. 37, ll. 12-20, herein.  Without explanation, the Board reversed on February 7, 2008, based upon exactly the same evidence and records they had had previously.  No records reveal the Board's position that Jimmy was blind before the March 16, 2008 deposition.  Dr. Falik did testify in deposition, however,  about what had <u>not</u> been the basis of the Board's decision.  Dr. Falik testified that fatigue, mentioned in Dr. Rao's

note stating that Jimmy could not be a Communications Specialist, Ex. 3A herein, was of no concern to the Board, and had no influence in the determination.   ("No. She stated that he was able to perform a more sedentary occupation of emergency dispatcher.  Medically …that's not a limiting factor." Falik Dep. p. 50, l.19- 51, l.17).[6]

THE ALLEGATION THAT JIMMY NEEDED LIGHT DUTY IS A FABRICATION

Defendant alleges, falsely and repeatedly, that Jimmy was not cleared for regular duty, and sought only to return to work with reduced hours.  *Def's Brf. pp. 4-6, 18, 22-23.*  Reduced hours were not permitted by the County.  *Def's Affidavit of Rhonda Jackson.*  There was never any further discussion - as there was never any further need for -  reduced hours, after Jimmy's October, 2007 request, which his doctors had characterized at the time as "light duty," and which had been refused. *Pl's Memo, p. 4.*  The evidence clearly shows Defendant's repeated allegation that Jimmy could only work a reduced schedule to be a misrepresentation.

Four releases from Jimmy's physicians authorize him to return to regular work: nowhere is there any mention of reduced hours in any of them.  Ex. 2; Ex. 3A; Ex. 8: November 6, 2007 Letter from Dr. Phillips; Ex. 9: November 7, 2007 Release from Dr. Rao. *(all  attached  herein).*  Defendant's own documents show the allegation to be a fabrication. Defendant submitted a September 11, 2008 Memorandum to the Prince George's County Human Relations Commission, as required in response to Jimmy's Charge of Discrimination.  The timeline of events at pages 5-8  of  the Memorandum states that on December 3, 2007: "Mr. Hook was released to return to full duty as a Communications Specialist II." Ex. 10: Memorandum to Human Rights Commission , herein, p. 8.  A December 3, 2007 email from

---

[6] Dr. Rao had stated that limitations, including fatigue still prevented Jimmy from doing the strenuous manual labor of a Communications Specialist. Ex. 3A, herein.  That job involves carrying forty pound radio components, working lying under the hoods of vehicles, crawling into police car trunks spending hours working there to install computers, and climbing around fire trucks to put up antennae. *See* Flaherty Dep. pp. 112-115, herein.  Dr. Rao said that Jimmy was fully fit however for Emergency Dispatcher.

Directory Flaherty to Supervisor Wayne McBride  states: "The Office of Human Relations Management has advised that Jimmy Hook has been released to return to full duty as a Communications Specialist II. He will be carried on donated leave through December 8…He has been told to report to the CCF at 9:00…." Exhibit 11: <u>Flaherty Email to Wayne McBride,</u> herein.

   A fireman all of his life, Jimmy, like most of the firemen with whom he spends much of his time, makes a distinction between physically demanding jobs, and desk jobs, like his Emergency Dispatcher job, which are often referred to as "light duty," not to imply reduced hours, but referring to the fact that it is an office job.  *Affidavit of Fire/Paramedic Lieutenant  Steve Brown*   Jimmy testified in deposition that he had never asked for "a shorter shift" at the December 10, 2007 meeting with Flaherty.  Hook Dep. p. 31, ll. 1-9.  Asked whether he was "aware that there was no light duty available at that time," Jimmy explained: "…that's not the way that I viewed it at all…I viewed the dispatch position, and I always have, as a light duty position…..As my example…the fire department would take injured and sick fire fighters and place them in a dispatch position in a light duty capacity instead of being out doing physical activity.  And that's the way I had always viewed it…If you say light duty, that to me means the dispatch function, a sedentary job."  Hook Dep. p. 31-33, herein.   Though an important position, the Emergency Dispatcher job is nonetheless performed almost entirely by sitting in the same chair all day.  Herron Dep. p. 22, ll. 1-16, herein.  Firemen and policemen have often been assigned to the Emergency Dispatcher job when they have been sick or injured. It is not uncommon to hear the office jobs at the County referred to as "light duty." Fire/paramedic Lieutenant Stephen Brown confirmed that recovering firemen were assigned to "desk jobs like Emergency Dispatcher" which were called "light duty" because they did not require the fireman to be as "physically able." *Affidavit of Lieutenant Stephen Brown.*

   Jimmy had gone to the December 10, 2008 meeting with Flaherty expressly to explain that he couldn't do the strenuous manual labor of the Communications Specialist position: he needed his job

back, his usual job back, the "light duty" desk job, Emergency Dispatcher.  As Defendant will not deny, Jimmy never spent a moment or an hour working as a Communications Specialist: he was an Emergency Dispatcher at all times during his employment with the County.  In an Interrogatory Response describing the meeting, Jimmy made a reference to his release to his "light duty" job, meaning his Emergency Dispatcher desk job.  That is the basis of Defendant's allegation. *Def's Brf. p. 6.*  Ex. 12: <u>Plaintiff's Responses to Defendant's Interrogatories, Interrogatory No. 4.</u>  Nowhere, in Jimmy's  response, or anywhere else this case, is there any evidence that Jimmy had any further need, or made any further request "to work four hour shifts" after the October request.  That is confirmed in Jimmy's responses to other Interrogatories which asked when Jimmy had been able to return to regular work.  His sworn response was always January, 2008.[7]  Ex. 12, <u>Plaintiff's Responses to Defendant's Interrogatories, Nos. 3, 8, 11,</u> herein.   For example, at Interrogatory No. 3, where Jimmy was asked what date he was able to return to regular work, and what restrictions were imposed, he answered:

> RESPONSE:  Plaintiff was able to return to a regular work schedule in a sedentary job without restriction in January, 2008, and he therefore sought to return to work.  As described in the physician's OK to "return to work" (from Dr. Jyothi Raomahadevia) which he submitted, he had no restrictions beyond the accommodation sought - return to a sedentary job.

> Ex. 12: <u>Plaintiff's Responses to Defendant's Interrogatories, No. 3.</u>
> *See also Interrogatories and Responses to Nos. 8, 11, Ex. 12 herein.*

None of the documents in this case mention a restriction to a four hour shift.[8] If Jimmy had been able to work only four hours, which was not permitted,  Director Flaherty would not have taken all the steps, described in great detail at *Def's Brf.  pp. 6-7, 18, 21-23,*  to process Jimmy's return, nor would the Medical Board have been asked to review his case, which would all have been pointless.

---

[7] Jimmy had earlier releases to work in November, but it was January, 2008 when his doctors clarified to which job he should return and so he answered, January.

[8] For example, Ex. 10, Defendant's Memorandum to the P.G. Co. Human Relations Commission; or Ex. 7, the County's letter of inquiry to Dr. Phillips; or Ex. 5, documents submitted to the Medical Board for review; or *Pls Brf. p. 6, Ex. 7,* the letter the County sent to Jimmy on January 3, 2008  instructing him to obtain more specific releases.

Defendant's allegation that Jimmy was never able to work regular hours is demonstrably false and a fabrication, as evidenced by Defendant's Memorandum to the Human Rights Commission, their other documents, internal email, four unrestricted releases to return to work from Jimmy's physicians, and by common sense. Defendant's lengthy discussions of Jimmy's remaining leave time in their Brief, *Def's Brf. pp.4- 6, 22-23,* are irrelevant. Jimmy didn't need leave time for any reduced schedule.

THE NEW APPLICANT'S TEST IS IRRELEVANT TO THIS CASE

As is well established in case law, the Criticall test described by Defendant, which Jimmy took in January, 2010, is entirely irrelevant to this case, an event falling well outside of the relevant time frame, winter 2007-2008, and it cannot be considered by the Court.

At the time Jimmy was terminated, he was a current employee, an Emergency Dispatcher. Currently employed Dispatchers, like Jimmy, who were employees already on board, were never asked to go back and take the test. To this day, current employees, once they are on board, are never asked to go back and take the test. The typing speed test applies only to new people who are seeking to hire on from outside. Jimmy was not such a person. *See Affidavits provided.*

Although it is Plaintiff's continued position, indisputable under the case law, that the test is irrelevant, Defendant's sweeping description, distorting reality beyond recognition, prompts a response in the form of background information for the Court. Criticall consists of a battery of complex activities testing a multiplicity of skills at which Jimmy has always excelled, and at which he did recently excel in the January test, where he got a score of "88" overall, only falling very slightly short on a typing speed count that had been added to the test in the last few years, many years after Jimmy hired on. *Affidavit of James Hook.* (Criticall is designed to test for example: multi-tasking, deductive reasoning and reaction time, logical inferences, narrative note taking, eliminating similar and potentially confusing sequences, clear presentation of facts, filtering non-relevant information, map reading and

14

manipulating geographic directions.) [9]   The abilities which had made Jimmy so successful, including typing speed which was never a strength, were the same in February, 2008, and are the same today as they were all throughout his eighteen years of outstanding performance.  As Director Flaherty testified: Q: "You'd be more than happy to have him return to work with you?" A: "Absolutely.  As I said before, he was a very talented employee, and an asset to the organization…I will reiterate, he was a phenomenal employee." Director Flaherty Dep., p. 222, ll. 9-13; p. 49, ll. 1-7.  *Pl's Memo. p. 1.*  Jimmy was, and is now the same "phenomenal" "asset to the organization" described by his supervisor, Director Flaherty.

When Jimmy was trying to get back to his job after his illness, he was not a new applicant: the typing speed count could never have been applied to him.  None of Jimmy's colleagues, who like him were already on board, have ever been required to go back and take the test - neither co-workers, subordinates, nor supervisors.  Current Emergency Dispatchers, Korri Kaplan and Stephanie Miller, who were on board in winter of 2007-2008, describe: "People already employed did not have to go back and take the test which counts how many keystrokes per hour you can type… even though new applicants are required to do that." *Affidavit of Emergency Dispatcher, Korri Kaplan.*  "I was never asked to go back and take any kind of test that counted how many keystrokes I could type per hour. Employees who were already on the job in winter 2007-2008 didn't have to do that. As they were already employed [sic]." *Affidavit of Emergency Dispatcher Stephanie Miller*.

Applying the typing speed assessment to Jimmy is a continuation of the discriminatory treatment to which he has been subjected.  As the case law discussed below establishes dispositively, the

---

[9] Described at  www.Criticall.com, Ex. 13.  Leaving no stone unturned after the discriminatory termination, Jimmy applied repeatedly to get back to his job, and when he took the test he achieved a typing speed score of 11.6 KSPM rather than 11.9, consistent with another typing speed test Jimmy once took in the past in another context.  Jimmy's typing speed was consistent, and it is clear that it never hindered his outstanding performance. *Aff. J. Hook.* It would obviously be grossly unfair if Jimmy were to be penalized for making every effort to mitigate his damages.   Irrelevant but of interest: Jimmy will be allowed to retake the test after the typing course he is taking for his general advancement.

test could not have been required of Jimmy, and is simply not relevant.  This suit is brought for events surrounding Jimmy's February, 2008 termination.    Events in January, 2010 cannot be considered.

Caselaw Establishes the Relevant Time Frame

Whether or not a plaintiff was qualified must be determined as of the time of the adverse employment decision, based upon his status and circumstances at that time.  29 CFR § 1630.2(m).  The Fourth Circuit confirmed in  *E.E.O.C. v. Stowe-Pharr Mills, Inc*., 216 F.3d 373, 379 (4th Cir. 2000) that "the date of an adverse employment decision is the relevant date for determining whether a plaintiff is a 'qualified individual with a disability.'" The Fourth Circuit repeated the principle in *Myers v. Hose*, 50 F.3d 278 (4th Cir. 1995).  As to whether a disabled individual is a qualified individual,  "the statutory provisions are formulated entirely in the present tense." *Id. at 283*.  The fact that the person may or may not be able to do the job in a different time period is irrelevant in the case.

In *Wilson v. Phoenix Specialty Mfg. Co., Inc.,* 513 F. 3d 378 (4th Cir. 2008), the Fourth Circuit affirmed Judgment[10] and punitive damages for Wilson who suffered from Parkinson's disease.  By the time of trial Wilson could not work at all.  The Court found that though Wilson was impaired during his employment, he had still been able to fulfill the demands of his job, and the termination was discriminatory.  Wilson's employment situation at the time of the bench trial was irrelevant.

Courts in every circuit acknowledge that no consideration may be given to factors or circumstances as they may exist on a date earlier or later than the disputed employment decision. *Griffith v. Wal-Mart Stores, Inc.,* 135 F.3d 376 (6th Cir. 1998) (irrelevant whether the plaintiff is qualified on some other date); *Sunkett v. Olsten Temporary Services,* 21 A.D.D. 500 (N.D. Cal. 1995) (that plaintiff's seizures increased and he was unfit beginning on the day after termination is irrelevant); *Maciejewicz v. Oak Park Public Library*, 1996 WL 501743 (N.D. Ill. 1996) (that former custodian was

---

[10] The Court awarded Judgment to Plaintiff in that case after a bench trial, not as Plaintiff erroneously stated at page 35 of *Pl's Memo, s*ummary judgment.

currently disabled did not demonstrate that he was not qualified to be a custodian at the time of his termination); *E.E.O.C. v. Voss Elec. Co. d/b/a Voss Lighting,* 257 F. Supp. 2d 1354 (W.D. Okla. 2003) (plaintiff's condition at the time of trial irrelevant); *accord, Zenor v. El Paso Healthcare System, Ltd.*, 176 F.3d 847 (5th Cir. 1999); *E.E.O.C. v. Wal-Mart Stores, Inc.*, 477 F.3d 561 (8th Cir. 2007).   The law is clear that the Court must disregard any recent new-applicant testing to which Plaintiff has been subjected.

It could also be noted that Defendant discloses the defense for the first time in their dispositive motion, never having provided information required in discovery, as for example: documents including a copy of the test, relationship to essential functions, the scores of Jimmy and other applicants, or other related information required, and Defendant should be precluded from raising the defense even if it were relevant.

IV.   PLAINTIFF'S EVIDENCE IS UNCONTRADICTED

Plaintiff provided unrestricted releases from treating ophthalmologist, Dr. William Phillips, a board-certified specialist in retina conditions and diabetic retinopathy for seventeen years, a noted authority who has published extensively in the field, his treating ophthalmologist who had also performed the surgery; and from primary care physician, Dr. Rao, a board certified internist who had cared for Jimmy continuously throughout his illness and recovery.  Phillips Dep. p. 7-8.  Ex. 14: Dr. Phillips' Curriculum Vita, Ex. 3: Release from Dr. Rao.  As previously described, the County has adopted the detailed visual requirements for an Emergency Dispatcher approved by the National Fire Protection Association and Jimmy provided verification that he could meet them.  In a letter to Dr. Phillips, the County specifically asked whether Jimmy could meet those visual requirements, which were enumerated for Dr. Phillips, and they also asked whether Jimmy's vision was adequate to perform the job of Emergency Dispatcher, the job description for which was attached.  Ex. 7, herein.  Dr. Phillips

responded, "Mr. Hook should be able to perform the duties described." Ex. 2, herein. (Defendant's

allegation, *Def's Brf. pp. 9,24,* that Dr Phillips "did not state that Plaintiff could perform the job duties

of an Emergency Dispatcher" is obviously unfounded.)  Dr. Rao also stated that Mr. Hook was under her

care, and that "He is able to perform a more sedentary job of Emergency Dispatcher."  Ex. 3A: <u>January

10, 2008 Release by Dr. Rao,</u> herein.

     Both physicians were well informed.  Dr. Rao had been treating Jimmy for five years, was his

primary care doctor throughout his illness, and met with him on the day she wrote the release.  She was

"aware that an Emergency Dispatcher makes critical emergency decisions as part of the job," and had

looked at the job description and discussed the tasks with Jimmy.  Ex. 3B: <u>Affidavit of Dr. Rao.</u>

     Dr. Phillips had examined Jimmy twenty-five times in the recent past.  Phillips Dep.  p. 10, ll.13-

20.  He had a full understanding of the job in question, stating he was aware that "Mr. Hook would be

returning to a position where he would be required to look at computer screens and input data into the

computer from…multiple sources;" that the position was an "emergency dispatch position within Prince

George's County Public Safety Communications;" Phillips Dep. p. 24, ll. 8- 20; that using a computer

monitor , the job "would …. require him to be able to accurately input information and relay information

to emergency personnel to render medical assistance."  Phillips Dep. p. 29, l. 8-9; p. 31, ll. 7-13; p. 36,

ll. 6-15.  Dr. Phillips had reviewed the duties of an emergency dispatcher, and testified that neither stress

from the job, nor the twelve hour shifts would lessen Jimmy's ability to perform the job functions. Nor

did Dr. Phillips express any reservations based upon the information that Prince George's County

receives a high volume of emergency calls which Jimmy would be handling.  Phillips Dep. p. 25, ll. 7-

12; p. 26, ll. 2-12; p. 36, ll. 16-22.

     Days after his surgery, Jimmy put the glasses he had always worn back on and resumed the life

of a normal sighted person, driving his son to and from school and himself to the gym each day,

cooking, watching TV, playing with his son and dog, playing the guitar, using a computer and cell phone, fixing meals, watching TV and playing video games.  He spent up to 12 hours a day reading and writing on a project reviewing standard operating procedures at the Hyattsville Volunteer Fire Department, and  doing intricate detailed drawings of fire trucks.  *See Pl's Brf. p. 3-4, Ex. 2; Affs. of Chief T. David Hang,  David Cooksey,  Toni Cooksey, Joe Bickley, Carolyn Kettenhofen, James Hook.*

Defendant never had any evidence contradicting the up-to-date and authoritative statements by not one but two medical experts that Jimmy could do the job.  They admit they did no fact-based inquiry.  They ignored current evidence that Jimmy had had successful treatment.  Because Jimmy had once had blood in his eye obstructing his vision, Defendant made the unexamined, unreasonable,  and discriminatory assumption that he was permanently blind.

## V.    DEFENDANT'S DIRECT THREAT DEFENSE FAILS

Defendant discusses the responsibilities of dispatchers who send emergency assistance in response to calls which have life and death repercussions.  Arguing at pages 23-24, and by implication throughout that Jimmy's termination was a public safety issue, Defendant relies on a "direct threat" defense, although the term is not used.  "Direct threat means a significant risk of substantial harm to health or safety of the individual or others….The determination that an individual poses a 'direct threat' shall be based on an individualized assessment of the individual's present ability to safely perform…the job, based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence."  29 C.F.R. § 1630.2(r)(2005); *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 86 (2002); *Montalvo v. Radcliffe,* 167 F.3d 873, 876 (4th Cir. 1999).

Direct threat is an affirmative defense, and in the Fourth Circuit, as in many circuits, the burden of proof is upon the employer, *Chevron U.S.A., Inc. v. Echazabal,* 536 U.S. 73, 78 (2002), an allocation supported by statements in the Act's legislative history. ("The employer must identify the specific risk

that the individual with a disability would pose." H.R.Rep. No. 101-485(II), at 56 (1990)).  That the

burden is upon the employer is well established in the Fourth Circuit. *Darcangelo v. Verizon Commc'ns,*

*Inc.,* 292 F.3d 181, 188 (4th Cir. 2002); *Brooks v. Micron Tech., Inc.,* WL 1779693 *5 n.5 (E.D.Va.

2010) ("Construing the statute as the Fourth Circuit has in *Darcangelo…* the Court concludes that, here,

Micron has the burden of establishing that Brooks presented a direct threat to himself or others"); *Taylor*

*v. Hampton Rd. Reg. Jail Auth.,* 550 F. Supp. 2d 614, 619 (E.D.Va. 2008) ("The burden lies on the

employer to show that the disabled employee would represent a direct threat" *citing Darcangelo, supra.*)

It was Defendant's burden to prove, using "the most current medical knowledge" or "the best

available objective evidence" that allowing Jimmy to return to his Emergency Dispatcher job was  a

significant risk.  29 C.F.R. § 1630.2(r).  As the Supreme Court explained in *Bragdon v. Abbott,* 524 U.S.

624, 650 (1998), the Court's task was to assess whether the actions by the decision maker were

reasonable in the light of the available medical evidence.  The focus is upon the actions of the decision

maker, and not upon an independent analysis of risk by the Court.  *Brooks v. Micron Technology,* 2010

WL 1779693 *6 (E.D. Va., 2010) ("The Court should not independently assess whether [the employee]

posed a direct threat but instead must evaluate whether [the employer's] decision was objectively

reasonable" citing *Jarvis*); *Jarvis v. Potter,* 500 F.3d 1113, 1122 (10th Cir. 2007)(" In evaluating an

employer's direct-threat contention, the fact-finder does not independently assess whether it believes that

the employee posed a direct threat.")

 In *Bragdon, supra,*  the Supreme Court proceeded to do just such an assessment of the evidence

Bragdon had relied upon to refuse his patient dental treatment, analyzing whether the assumptions

drawn from it were justifiable.  *Bragdon, at 650-655.*  Similarly, for the direct threat defense to apply

here, this Court must find that the Medical Board's assumption that Jimmy was still blind was

justifiable, that the assumption was a " reasonable medical judgment," and that in making that decision

the Board relied upon  "the most current medical knowledge and/or on the best available objective

evidence." "A stringent standard in the direct threat defense is 'essential if the law is to achieve its goal

of protecting disabled individuals…'" 28 C.F.R. § 35.104, App.; *Helping Hand v. Baltimore Co., MD,*

2006 WL 2067942 *3, n.10 (D.Md)

In their decision to terminate Jimmy, Defendant relied entirely upon the Medical Board whose

Chairman, Dr. Falik, testified as Defendant's designee for the  decision.  Dr. Falik, who never examined

Jimmy or made any inquiries into his condition, couldn't explain how Jimmy would be able to see to

"drive a fire truck on emergency operations, able to pull people out of mangled cars in horrific

accidents…drives and reads every day all day;" and be released by two board-certified physicians to

perform the job of Emergency Dispatcher, and still be blind, because "I'm not an ophthalmologist.  I

can't answer that."  Falik Dep. p. 45, l.17-46, l.9.   Dr. Falik said he "accepted" the opinion of Dr.

Phillips, the specialist most familiar with Jimmy's visual situation, who had found that Jimmy could do

the job.  Falik Dep. p. 44, ll. 8-16.   But Jimmy was still unfit, because Dr. Phillips, in his letter, had only

verified that Jimmy could meet the required national visual standards set out by the National Fire

Protection Association, and could do the job.  He hadn't said that Jimmy wasn't blind. Falik Dep. p. 29,

ll.1-11.  Falik didn't see any need to know whether the obstruction to Jimmy's vision could have been

temporary, something that didn't last forever.  Asked if he sought any information about whether it was

temporary, Dr. Falik answered that he had not   - "Of course not….Why would I."  Falik Dep. p. 59, l.6 -

60, l.11. This cannot be a "reasonable medical judgment."  Defendant's evidence cannot in any way be

described as the "most current medical knowledge or the best available objective evidence."

The employer in *Lowe v. Alabama Power Co.,* 244 F. 3d 1305 (11th Cir. 2001), made its

decision, just as in this case,  relying upon evidence from a cursory examination by the company doctor

nine months prior, when the employee was still ill and on leave. Making unwarranted generalizations

and assumptions about the impairment from which Lowe suffered, Defendant ignored evidence that Lowe had recovered, *id. at 1306,* just as here, where the County relied upon information from when Jimmy was on leave and was still ill, eight months prior, ignoring the evidence that Jimmy had recovered.  Defendant, like Alabama Power, did not fulfill the requirements of the direct threat defense. "Alabama Power's decision that Lowe was not able to perform the [job] safely was not based, therefore, on particularized facts using the best available objective evidence as required by the regulations." *Id. at 1309.*

The Court in *EEOC v. Browning-Ferris, Inc.,*  262 F. Supp. 2d 577 (D. Md. 2002) discussed the direct defense, skeptical that the employer "had met its legal obligations under the ADA to make a reasonably informed and considered employment decision." *Id. at 590.*  It was doubtful  whether Defendant had used either "the most current medical knowledge or the best available objective evidence," where  they relied upon their own doctor, not a specialist in the disease in question, their doctor had "minimal experience" with the disease, spent only 15 minutes examining the employee, failed to send her to another specialist although that option was available, did not consider opinions of specialists," and  "did not consult any of the doctors who had been, and were contemporaneously treating [her]." *Id. at 587-591, citing Montalvo v. Radcliffe,* 167 F.3d 873 (4th Cir.1999).  Similarly in this case, the County ignored the ophthalmologist, a specialist in the impairment, relied upon their own doctor who had "minimal experience ("I'm not an ophthalmologist." Falik Dep. p. 59, l.3)  who had spent <u>no</u> time examining the employee, failed to send him to another specialist although that option was available (Herron Dep. p. 21, herein), and "did not consult any of the doctors who had been, and were contemporaneously treating" Jimmy.   Falik Dep. p. 48, l.13 – 49, l.9.  Defendant did not rely upon "the most current medical knowledge or the best available objective evidence." *Accord, Echazabel v.*

22

*Chevron,* 336 F.3d 1023, 1032 (9th Cir. 2003) (opinions of physicians in unrelated fields was poor

evidence compared to opinions of specialists in the relevant impairment).

To raise the direct threat defense an employer must assess the nature and severity of the

impairment, duration of the risk, and the likelihood or imminence of potential harm.   29 C.F.R.

§1630.2(r); *Bragdon, supra at 661*.   Dr. Falik was asked if he sought information about the duration of

Jimmy's alleged impairment, or about the likelihood it "would lead to a mishandled call."   He answered,

"Of course not." Falik Dep. p. 60, l.20 – 61, l.9.   Neither decision maker Herron nor Director Flaherty

had any information about the duration of Jimmy's alleged limitations.   Falherty Dep. p. 143, ll. 5-12;

Herron Dep. p. 28, ll. 13-18.   They testified they had no idea about the nature or severity of his "eye

issues." Flaherty Dep. p. 143, Herron Dep. p. 26, ll. 16-18.

Defendant was responsible to gather any information they needed for a fact intensive assessment

of the particularized facts about Jimmy's condition.   "The question [whether or not a disabled individual

represents a direct threat] is fact intensive." *Montalvo, supra, at 877.*   The employer is obligated to

"gather substantial information" about the employee's medical condition, "particularized facts," the best

evidence "reasonably available."   *Echazabal v. Chevron,* 336 F.3d 1023, 1033 (9th Cir. 2003);   *Kim v.*

*MedImmune, Inc.,* 2004 WL 3313219 *2 (D.Md. 2004).   Final decision maker Vernon Herron, Director

of Public Safety Communication Charlynn Flaherty, and Medical Board Chairman/ designee, Dr. Falik,

all testified they had no information about Jimmy's current vision, they never spoke to Jimmy or sought

first hand information from him or from anyone else, never sent him for an independent exam, never

consulted his physicians, and never took any steps to gather further information.[11]

Defendant's decision to terminate Jimmy, because his vision had once been obstructed from

diabetic retinopathy, was "based on stereotypes and generalizations about the effects of a disability," as

---

[11] Falik Dep. p. 47, ll. 2 – p. 49, ll. 9;  Flaherty Dep. p. 141, l.8 – p. 143, l.12; Herron Dep. p. 24, ll. 2-
14; p. 27, ll. 9-13; p. 28, ll. 1-3; *See Pl's Memo. p. 16.*

the Fourth Circuit warned in their discussion of the direct threat defense in *Montalvo v. Radcliffe, supra, at 876.* The action by the County, purportedly in the interest of public safety, is what the Court described in *Chevron U.S.A., Inc. v. Echazabal,* 536 U.S. 73, 86 (2002): "This sort of sham protection is just what the regulation disallows, by demanding a particularized enquiry into the harm."

## VI.   FINAL ELEMENT: TERMINATION BASED UPON DISABILITY

It is not necessary to decide in this case whether getting assigned to one's own proper job is a substantive accommodation or not.  The issue is not failure to accommodate.  As in *Wilson v. Phoenix Spec. Mfg Co., Inc.,* 513 F.3d 378, (4th Cir. 2008), which the Fourth Circuit recently described, the discrimination and damage are "tied directly to his discriminatory termination and not to [Defendant's] failure to accommodate." *Id. at 388.*   Jimmy, like Wilson, had limitations and accommodation was requested, but the discrimination by the County, as with employer Phoenix, was the unwarranted assumption the Jimmy was not qualified, based upon the unjustified and unsupported assumption that he was blind.  Defendant relied upon the unexamined generalization that once Jimmy suffered obstructed vision from diabetic retinopathy, it could be presumed that he was permanently blind, despite uncontradicted current  information that he had been treated and his sight restored.  Therein lies the violation of the ADA.

 Accurate individual assessment of the actual capabilities of a disabled employee is required under the ADA, 29 C.F.R. Pt. 1630 app., §1630.2(m), and Defendant was also required to learn what "precise limitations" the employee might have,  29 C.F.R. Pt. 1630 app., § 1630(o), and to "cooperate in good faith when determining what accommodation-  if any - is required." *See Beck v. University of Wis. Board of Regents,* 75 F.3d 1130, 1134-35 (7th Cir.1996); 29 C.F.R. Pt. 1630 app., § 1630.9.  Plaintiff has previously set out extensive case law describing the responsibility and discussing consequences for employers who shirk it. *Pl's Brf. p. 34-41.* The significance of Jimmy's December 10, 2007 meeting

24

with Director Flaherty is that Jimmy gave notice that he was an individual with a disability for purposes of the ADA, and that his disability prevented him from doing the job to which he had incorrectly been told to report.  Defendant's argument that they engaged in an individual assessment and an interactive process, *Def's Brf. p. 21-22,* is not credible, where Defendant didn't even know that Jimmy was driving, reading, writing and living as a person with normal sight, and believed he was blind.  What Defendant would have learned, had they assessed Jimmy's "precise limitations," was that Jimmy didn't have any limitations at all, as long as he was returned to his regular job.

Contrary to Defendant's argument, *Def's Brf. p. 21,* Plaintiff having established that (1) he was covered under the ADA, and that (2) he was qualified and could perform the job, it remains only for him to establish (3) that he was terminated on the basis of his disability.  *Doe v. U. of Md. Med. Systems Corp.,* 50 F. 3d 1261, 1264-5 (4th Cir. 1995).   At pages 21-24 of their Brief Defendant seems to be arguing that Plaintiff has not established that Defendant terminated him on the basis of his disability, because they justifiably terminated him based on his disability.  Defendant does not have the required evidence to raise a direct threat defense, and Defendant's letter states that Jimmy was terminated based on a disability.  The last element for Plaintiff's case is established.  Defendant never had a credible reason to justify the termination, and they have raised no genuine issues of material fact disputing Plaintiff's proofs that he was qualified.  As a matter of law, Defendant has violated the ADA, where Jimmy is covered by the Act, could perform the job, and was terminated based upon his disability.